1    JOHN T. JASNOCH (CA 281605)
     **SCOTT+SCOTT ATTORNEYS AT LAW LLP**
2    600 W. Broadway, Suite 3300
     San Diego, CA 92101
3    Telephone:  619/233-4565
     619/233-0508 (fax)
4    jjasnoch@scott-scott.com

5    *Counsel for Plaintiff James Hill*

6    [Additional counsel on signature page.]

7

8                    **UNITED STATES DISTRICT COURT**
                   **NORTHERN DISTRICT OF CALIFORNIA**

9    JAMES HILL, Individually and on Behalf of      Case No. _____
     All Others Similarly Situated,
10
                            Plaintiff,
11                                                   **CLASS ACTION COMPLAINT**
            v.
12
     SILVER LAKE GROUP, L.L.C., BC
13   PARTNERS LLP, RAYMOND SVIDER, and
     JUSTIN BATEMAN,                                 JURY TRIAL DEMANDED
14
                            Defendants.
15

16

17

18

19

20

21

22

23

24

25

26

27

28

Plaintiff James Hill ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys for his Class Action Complaint against the above-named Defendants (defined below) alleges the following upon personal knowledge, as to himself and his own acts, and upon information and belief, as to all other matters, based on, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, media reports, filings with the U.S. Securities and Exchange Commission ("SEC"), trading records, press releases, and other publicly available information.

## NATURE OF THE ACTION

1.      This is a securities class action arising from the unlawful use of material non-public information by BC Partners LLP ("BC Partners") and Silver Lake Group, L.L.C. (together, with its affiliates, including, but not limited to, SLP III Investment Holding S.à.r.l., Silver Lake Partners III, L.P., Silver Lake Technology Investors III, L.P., Silver Lake Technology Associates III, L.P., and SLTA III (GP), L.L.C., "Silver Lake"), who collectively gained **over $185 million** in profits and losses avoided by selling shares of Intelsat S.A. ("Intelsat" or the "Company"), a Luxembourg-based satellite operator that provides television and radio communications, to Plaintiff and other unsuspecting and unwitting public shareholders.

2.      This action is brought on behalf of all those investors who purchased or otherwise acquired Intelsat shares contemporaneously with Defendants' unlawful trades from November 5, 2019 through and including November 18, 2019 (the "Class Period"), pursuant to §§20A, 10(b), and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§78t-1, 78j(b), and 78t(a).

3.      Since at least 2017, the Federal Communications Commission ("FCC") has explored ways to potentially free up various wavebands for future "5G" use.  Of particular interest was the "C-Band," a range of mid-level bands that Intelsat and a few other satellite operators had rights to use in the United States.

4.      Intelsat has since proposed numerous plans to clear hundreds of megahertz ("MHz") for 5G use in exchange for money.  At first, Intelsat submitted a proposal with Intel

Corporation ("Intel") calling for satellite operators to identify **geographic areas** across the country where they could clear the C-Band for terrestrial use.  Then, Intelsat and SES, a fellow FSS (defined below) operator in C-Band, announced their agreement to open a portion of C-Band spectrum to allow wireless operators to access 100 MHz of **nationwide** C-Band spectrum across the United States.

5.      Eventually, Intelsat joined the C-Band Alliance ("CBA"), a consortium of other FSS providers that utilize the C-Band in the United States (SES, Eutelsat, and Telesat), to propose another plan for bringing the spectrum into use within 18-36 months from a FCC order.  Central terms of the CBA's proposal included undertaking a private sale process for the spectrum, requiring the CBA to cover the costs of both adding the necessary additional satellite capacity and repointing antennas where needed for both senders and receivers, earmarking all proceeds of the private sale to the members of the CBA, and freeing up 200 MHz of spectrum.

6.      Analysts viewed the CBA proposal as "the most workable and timely solution," especially after the CBA amended its proposal to clear up an additional 100 MHz of C-Band spectrum within 36 months from a CBA-led auction.

7.      Then, on November 18, 2019, the FCC rejected Intelsat's proposal.  Further, FCC Chairman Ajit Pai ("Chairman Pai") appeared to foreclose any future prospects, conveying his support for a public rather than private auction of the C-Band spectrum.  Posting on his Twitter account, Chairman Pai announced, "I'm confident they'll quickly conduct a public auction that will give everyone a fair chance to compete for this #5G spectrum, while preserving availability of the upper 200 MHz of the band for continued delivery of programming."

8.      In response, the CBA issued a statement claiming that Chairman Pai's proposal failed to address "the critical involvement of the incumbent satellite operators in executing the complex task of reconfiguring and transitioning their networks."  Still, the CBA committed to "continue to work cooperatively with the FCC to develop an effective alternative plan."

9.     The market's reaction to this news was quick and harsh.  Intelsat's stock fell over 40% on extremely heavy trading, closing down from $13.41 per share on November 15, 2019, to $8.03 per share on November 18, the next trading day.

10.    As was later revealed, however, certain insider shareholders were able to sell a large chunk of Intelsat shares just before this massive stock plunge, capitalizing on their knowledge that Intelsat's proposals were viewed negatively by the FCC.  According to subsequent media reports, including those published by *Bloomberg News* and the *New York Post*, for example, on November 5, 2019, Intelsat's Chief Executive Officer ("CEO"), Stephen Spengler ("Spengler"), met with the FCC's senior counsel, Nicholas Degani ("Degani"), to discuss Intelsat's plan to sell spectrum. Following this meeting, and with the messages conveyed from the FCC in tow, Intelsat submitted a ***revised*** proposal to the FCC on November 8, 2019, offering to give up more spectrum in exchange for money.  Notwithstanding Intelsat's rush to submit a revised proposal, on November 6, 2019, before notice of the meeting was even posted on the FCC's website (which occurred on November 8, 2019), Defendants appear to have sold a 10 million block of Intelsat's shares for about $24.60 per share.

11.    It was then revealed that the "$246 million block was shopped after markets closed on Nov. 5" with "no advance warning that the sale was coming," that pressure was placed on "interested buyers" who "were told they had an hour or so to decide[,]" and that Defendants BC Partners and Silver Lake appear to have been the sellers of those shares.

12.    Both Defendants BC Partners and Silver Lake have long had significant control over the Company.  For example, Intelsat was first acquired by a consortium of BC Partners and Silver Lake investors in February 2008.  In December 2018, pursuant to a New Governance Agreement, which remains in effect today, BC Partners was given the right to "nominate (i) two directors for election to [Intelsat's] board of directors" as long as it maintains at least 25% of the Company's outstanding common shares; and "(ii) one director for election to [Intelsat's] board of directors" as long as it maintains at least 5%, but less than 25%, of the Company's outstanding stock.  Further, BC Partners was afforded "*Information Rights*," which entitled it to receive "board

meeting materials provided to each director."   Likewise, BC Partners was a party to a New Shareholders Agreement, also executed in December 2018 and still in effect today, between Intelsat and Silver Lake, which afforded Silver Lake the right to "receive certain information required to meet internal and external reporting or other legal/compliance obligations."

13.     Defendants BC Partners and Silver Lake knew, or were reckless in not knowing, that they were prohibited from trading based on this confidential market-moving information, but traded anyway, disposing to Plaintiff and other members of the Class (defined below) their Intelsat stock before this news was announced and the Company's shares plummeted.

14.     As a result, Plaintiff and the Class have been damaged from Defendants' violations of U.S. securities laws.

### JURISDICTION AND VENUE

15.     The claims asserted herein arise under §§10(b), 20A, and 20(a) of the Exchange Act, 15 U.S.C. §§78j, 78t-1, and 78t(a), and this Court therefore has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337 and §27 of the Exchange Act, 15 U.S.C. §78aa.

16.     Venue is proper in this District pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §1391(b).  Defendant Silver Lake is based in this District.

17.     In connection with the challenged conduct, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications, and the facilities of the national securities markets.

### PARTIES

**A.     Plaintiff**

18.     Plaintiff James Hill, as set forth in his accompanying certification, purchased Intelsat common shares during the Class Period and was damaged when the Inside Information[1]

---

[1]     "Inside Information" includes, but is not limited to, the existence and contents of the November 5, 2019 meeting between Intelsat and the FCC, which led to Intelsat submitting a revised proposal to the FCC on November 8, 2019.

was publicly disclosed at the end of the Class Period and the price of Intelsat common shares declined as a result.  Plaintiff is a resident of Gardena, California.

**B.    Defendants**

19.    Defendant BC Partners is incorporated in England and Wales.  Its registered office is located at 40 Portman Square, London.  BC Partners is authorized and regulated by the Financial Conduct Authority (the "FCA") in the United Kingdom.  BC Partners had been a significant shareholder of Intelsat since 2008.  It has two representatives on Intelsat's board of directors (the "Board"), Defendants Raymond Svider and Justin Bateman.  According to public filings, BC Partners, which owned over 40.6 million Intelsat shares as of September 30, 2019, sold over 5.9 million shares in the period ended December 31, 2019.

20.    Defendant Silver Lake Group, L.L.C. is a Delaware limited liability company with its principal place of business in Menlo Park, California.  Silver Lake Group, L.L.C. is an investment management firm registered with the SEC, with approximately $2.8 billion assets under management.  Silver Lake Group, L.L.C. is the sole member of Silver Lake Partners III, LP and effectively controls a number of related entities, including: SLP III Investment Holding S.à.r.l.; Silver Lake Partners III, L.P.; Silver Lake Technology Investors III, L.P.; Silver Lake Technology Associates III, L.P.; and SLTA III (GP), L.L.C. (Delaware).  These various entities controlled by Silver Lake Group, L.L.C. are collectively referred to herein as "Silver Lake."  According to public filings, Silver Lake, which owned over 9.8 million Intelsat shares as of September 30, 2019, sold over 2.8 million shares in the period ended December 31, 2019, downgrading it to Intelsat's fourth-biggest shareholder from the second biggest.  Prior to this disposition, Silver Lake's 9.8 million shares represented approximately 7% of the Company's total shares outstanding.[2]

---

[2]    On February 12, 2020, Silver Lake filed a Schedule 13G with the SEC, which disclosed its reduced Intelsat position as of December 31, 2019.  According to that filing, Silver Lake's ownership percentages "assume that there are 141,000,000 common shares outstanding, based on the Issuer's [*i.e.*, Intelsat's] Report on Form 6-K filed with the Securities and Exchange Commission on October 29, 2019."  Accordingly, Silver Lake's percentage ownership before its disposition, calculated above, is based on the same assumption that there were 141 million common shares outstanding at the time.

21.     Defendant Raymond Svider ("Svider") became a director of Intelsat in February 2008 and the Chairman of the Board in May 2008.  Svider is also a director and Chairman of the board of directors of Intelsat Global Holdings S.A. and has been since July 2011.  Svider is also currently Chairman of BC Partners and is based in its New York office.

22.     Defendant Justin Bateman ("Bateman") is a director of Intelsat and has served as such since July 2011.  Bateman is also a Partner of BC Partners and is based in its New York office.

23.     "Defendants" collectively include BC Partners, Silver Lake, Svider, and Bateman.

## SUBSTANTIVE ALLEGATIONS

### A.     Background on Intelsat, BC Partners, and Silver Lake

24.     Intelsat is a satellite operator that provides TV and radio communications. According to Intelsat, the Company "hold[s] the largest collection of rights to well-placed orbital slots in the most valuable C- and Ku-band spectrums."  The Company's "fleet of 54 geosynchronous satellites" (as of December 31, 2019) covers "more than 99% of the world's populated regions."  Its "satellites primarily provide services in the C- and Ku-band frequencies, which form the largest part of the fixed satellite services ('FSS') sector."  The C-band spectrum includes bandwidth that can be used for 5G, the fifth generation of wireless communications technologies supporting cellular data networks.

25.     Intelsat was organized as a public limited liability company (société anonyme) under the laws of the Grand-Duchy of Luxembourg on July 8, 2011.  The Company's principal executive office is in Luxembourg.  Its common shares are listed on the New York Stock Exchange ("NYSE") under the symbol "I."  Intelsat completed its initial public offering ("IPO") on April 23, 2013.

26.     In 2008, before it was a public company, Intelsat was acquired in a transaction led by Defendants BC Partners and Silver Lake.  BC Partners and Silver Lake have enjoyed access to, and/or otherwise have controlled the activities of, Intelsat.  Both have also been granted, expressly, Board-level access to the Company's non-public information.

27.    For example, in connection with the Company's IPO, Intelsat paid approximately $39.1 million to BC Partners and Silver Lake to terminate the monitoring fee agreement with those parties under which they provided certain monitoring, advisory, and consulting services to Intelsat and its subsidiaries.  In addition, prior to its IPO, Intelsat entered into a governance agreement with affiliates of BC Partners and Silver Lake that, subject to their percentage of ownership, granted BC Partners the ability to nominate up to four directors to the Board, Defendants Svider and Bateman, Denis Villafranca, and Simon Patterson (two of whom presently serve on the Board), and Silver Lake the ability to nominate one director to the Board.

28.    These agreements and rights to appoint members to the Board remained following Intelsat's June 6, 2018 secondary offering ("June SPO").  According to the registration statement and prospectus filed with the SEC in connection with the June SPO, BC Partners and Silver Lake were expected to hold in the aggregate approximately 58-59% of Intelsat's common shares and that "by virtue of their share ownership, [they] may be able to influence decisions to enter into any corporate transaction or other matter that requires the approval of shareholders."

29.    The registration statement and prospectus issued in connection with the Company's November 30, 2018 secondary offering ("November SPO") likewise noted BC Partners' and Silver Lake's significant Intelsat ownership, stating:

> Immediately following the consummation of this offering, BC Partners, Silver Lake and their affiliates (the "Sponsors") are expected to hold in the aggregate **approximately 49.3%** of our common shares, assuming no exercise of the underwriters' option to purchase additional shares. By virtue of their share ownership, the Sponsors may be **able to influence decisions** to enter into any corporate transaction or other matter that requires the approval of shareholders.

[Emphasis added.]

30.    Then, in December 2018, Intelsat entered into a New Governance Agreement with BC Partners and a New Shareholders Agreement with BC Partners, Silver Lake, and other affiliates – both of which remain in effect today.  Pursuant to the terms of the New Governance Agreement, BC Partners was afforded the right to nominate two directors to the Board if it owns at least 25% of Intelsat's outstanding common shares (otherwise one director provided it owns at least 5%) and certain information rights, "***including the receipt of the board meeting materials provided to each***

*director*."  [Emphasis added.]  Similarly, under the New Shareholders Agreement, Silver Lake, provided it owned over 5% of Intelsat's outstanding shares, was given the right to "*receive certain information required to meet internal and external reporting or other legal/compliance obligations*."  [Emphasis added.]

**B.  Intelsat's Efforts to Monetize Its Rights to the "Spectrum"**

31.  In July 2017, the FCC published a Notice of Inquiry, initiating the process of exploring the suitability of bands between 3.7 GHz and 24 GHz for wireless broadband use.  Three specific mid-range bands were identified for expanded flexible use: 3.7-4.2 GHz (the "C-Band"); 5.925-6.425 GHz; and 6.425-7.125 GHz.

32.  In October 2017, Intelsat and Intel submitted a joint proposal related to the FCC's Notice of Inquiry, proposing a "market-based" approach to unlock spectrum in the 3700-4200 MHz C-Band with an expedited time to market of one to three years versus an FCC proceeding that could take "up to a decade."  Under the proposal, current holders of the spectrum would be able to reach commercial agreements directly with parties interested in utilizing the C-Band spectrum.

33.  Intelsat believed that careful coordination was necessary to protect incumbent users – predominantly FSS satellite operators – from interference and impairment.  In its initial proposal, Intelsat and Intel suggested that satellite operators would identify geographic areas across the country where they could clear the C-Band for terrestrial use.  Clearing the C-Band could include transitioning services/users to another portion of the C-Band or moving ground antennas.

34.  Subsequently, Intelsat and SES – a fellow FSS operator in C-Band – announced an agreement to open a portion of their C-Band spectrum to allow wireless operators to access 100 MHz of *nationwide* C-Band spectrum across the United States.

35.  Analysts viewed this subsequent proposal as an excellent opportunity for "the FCC to execute on a key White House initiative" to enable a quick path to 5G, which it viewed as being a "key battle ground with foreign technology companies."  For example, RBC Capital Markets concluded in its June 20, 2018 report that "there *is a very high likelihood* the FCC ruling include

Intelsat's proposal" and that "the politics leave Intelsat and SES *in prime position* to capitalise on their C-band spectrum."  [Emphasis added and in original.]  As a result, RBC Capital Markets raised its Intelsat price target "from $5 to $30."

36.     In July 2018, the FCC's 5G effort became even more focused with the issuance of a Notice of Proposed Rulemaking ("NPRM"), which sought comments to help in developing a specific strategy for making C-Band spectrum available for terrestrial wireless use.  Specifically, the FCC was looking for responses regarding how terrestrial use of the frequency should be structured (*i.e.*, band plan, how much spectrum, etc.) and what method the FCC should use to distribute the spectrum for terrestrial use.  Moreover, the FCC asked for comments on making the spectrum available through a Market-Based Mechanism under which the incumbent FSS providers would make spectrum available, handle the sale of that spectrum, and then handle the clearance process.  In addition, the FCC discussed the potential for an Auction Mechanism, under which it would auction off the spectrum itself under a number of possible structures.

37.     Comments to the NPRM were received in October 2018 and replies to those comments in mid-December 2018.  In order to respond to the NPRM, and provide a united front through the rulemaking process, the four FSS providers that utilize the C-Band in the United States (Intelsat, SES, Eutelsat, and Telesat) banded together in October 2018 to create the CBA, allowing the companies to provide a single response to the NPRM.

38.     The CBA's proposal focused on speed to market, emphasizing that it would allow the spectrum to rapidly be brought into use with the transition completed between 18 and 36 months from a FCC Order, and called for satellite providers to use a private sale process for the spectrum, keeping all the proceeds, but also covering the costs of both adding the necessary additional satellite capacity and repointing antennas where needed for both senders and receivers. It also said 200 MHz of spectrum would be freed up, explaining that no more would be possible if service to current C-Band users continued.

39.     Analysts again viewed the CBA proposal as "the most workable and timely solution."  Nonetheless, the CBA continued to update its proposal in response to competing bids

1   or negative comments.  By October 2019, for example, the CBA offered to clear up to 300 MHz

2   of C-Band spectrum within 36 months from a CBA-led auction.

3        **C.**    **The November 5, 2019 FCC Meeting**

4        40.    On November 5, 2019, Intelsat's CEO, Spengler, met with the FCC's senior

5   counsel, Degani, to discuss Intelsat's plan to privately sell spectrum in a deal that had been

6   expected to result in a $7.4 billion payout to the company (the "FCC Meeting").

7        41.    On November 8, 2019, however, Intelsat, submitted a ***revised*** proposal to the FCC

8   offering to give up more spectrum in exchange for money.  On November 18, the FCC rejected

9   Intelsat's proposal and announced that it would publicly auction the C-band that Intelsat had been

10   hoping to sell privately.

11        42.    In a tweet posted to Twitter, FCC Chairman Pai conveyed his support for a public

12   rather than private auction of 280 MHz of C-Band spectrum, all but expressly rejecting Intelsat's

13   then-existing proposal, stating "I'm confident they'll quickly conduct a public auction that will

14   give everyone a fair chance to compete for this #5G spectrum, while preserving availability of the

15   upper 200 MHz of the band for continued delivery of programming."  In other words, the FCC

16   was not going to allow Intelsat to sell licenses to carriers in a private sale.

17        43.    In response, the CBA issued a statement claiming that Chairman Pai's proposal

18   failed to address "the critical involvement of the incumbent satellite operators in executing the

19   complex task of reconfiguring and transitioning their networks."  Still, the CBA committed to

20   "continue to work cooperatively with the FCC to develop an effective alternative plan."

21        44.    The market viewed the FCC's decision as a serious blow to Intelsat.  On November

22   18, 2019, Intelsat's stock price fell 40% to close at $8.03.

23        45.    The next day, a day after the FCC's decision, on November 19, 2020, Intelsat's

24   share price fell again, closing at $6.09, another one-day drop of over 24%.

25        **D.**    **Defendants Profit from Their Insider Trading**

26        46.    Based on public reporting and a review of Defendants' public filings, on November

27   6, 2019, Defendants sold a block of 10 million Intelsat shares for approximately $24.60 per share.

28

47.     According to an article in the *New York Post*, the $246 million share block was shopped after markets closed on November 5, 2019, there was no advance warning that the sale was coming, and interested buyers were told they had an hour or so to decide.  The article further explained how, to buyers, it seemed like a good deal at the time because Intelsat (and the other satellite companies) had proposed a plan to the FCC that compensated them for easing off certain airwaves.  Not to mention that Wall Street believed the plan was "the most workable and timely solution."

48.     As a result of these sales, which were priced 75% higher than Intelsat's share price following the FCC's announcement on November 18, 2019, Defendants BC Partners and Silver Lake gained **over $185 million** in profits and avoided losses.

## CONTEMPORANEOUS PURCHASES

49.     Plaintiff purchased Intelsat common stock contemporaneously (within the meaning of §20A of the Exchange Act, 15 U.S.C. §78t-1) with the Defendants' sales of Intelsat common stock.

## LOSS CAUSATION

50.     Defendants traded while in possession of material non-public information.  Later, when the information became publicly known, the price of Intelsat common stock declined sharply as a result of such disclosure.

51.     As a result of their purchases of Intelsat common stock during the Class Period, Plaintiff and the other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## CLASS ACTION ALLEGATIONS

52.     Plaintiff brings this action as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a class consisting of all persons who purchased or otherwise acquired Intelsat common stock during the Class Period and were damaged thereby (the "Class").  Excluded from the Class are Defendants, the officers and directors of Silver Lake

1 and BC Partners, members of their immediate families and their legal representatives, heirs,

2 successors or assigns, and any entity in which Defendants have or had a controlling interest.

3   53.   The members of the Class are so numerous that joinder of all members is

4 impracticable.  During the Class Period, Intelsat common stock was actively traded on the NYSE

5 and 141 million common shares were issued and outstanding.  While the exact number of Class

6 members is unknown to Plaintiff at this time. and can be ascertained only through appropriate

7 discovery, Plaintiff believes that there are thousands of members in the proposed Class.  Record

8 owners and other members of the Class may be identified from records maintained by Intelsat or

9 its transfer agent and may be notified of the pendency of this action by mail, using the form of

10 notice similar to that customarily used in securities class actions.

11   54.   Plaintiff's claims are typical of the claims of the members of the Class as all

12 members of the Class are similarly affected by Defendants' wrongful conduct in violation of

13 federal law, as complained of herein.

14   55.   Plaintiff will fairly and adequately protect the interests of the members of the Class

15 and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has

16 no interests antagonistic to or in conflict with those of the Class.

17   56.   Common questions of law and fact exist, as to all members of the Class, and

18 predominate over any questions solely affecting individual members of the Class.  Among the

19 questions of law and fact common to the Class are:

20   (a)   whether the federal securities laws were violated by Defendants' acts as

21 alleged herein;

22   (b)   whether Intelsat supplied the Inside Information to Defendants BC Partners

23 and Silver Lake and whether Defendants BC Partners and Silver Lake traded Intelsat shares

24 while in possession of material non-public information concerning Intelsat;

25   (c)   whether Defendants BC Partners and Silver Lake exercised control over

26 Intelsat within the meaning of §20(a) of the Exchange Act, 15 U.S.C. §78t(a), and whether

27 such Defendants are entitled to assert the defense of good faith;

28

(d)      whether the Inside Information was material; and

(e)      the amount by which Plaintiff was damaged and Defendants profited and avoided losses as a result of the securities law violations alleged herein.

57.      A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

58.      Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

(a)      Defendants failed to disclose material non-public information during the Class Period;

(b)      the omissions were material;

(c)      Intelsat securities traded in an efficient market;

(d)      Intelsat shares were liquid and traded with moderate to heavy volume during the Class Period;

(e)      Intelsat traded on the NYSE; and

(f)      Plaintiff and other members of the Class purchased and/or sold the applicable Intelsat securities between the time Defendants failed to disclose material facts and traded thereon and the time the true facts were disclosed, without knowledge of the omitted facts.

59.      Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

CLASS ACTION COMPLAINT

# CLAIMS FOR RELIEF

### FIRST CLAIM
### Violation of §10(b) of the Exchange Act and
### Rule 10b-5 Promulgated Thereunder
### (Against All Defendants)

60.   Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

61.   The information provided to Silver Lake and BC Partners about the FCC Meeting was material and non-public.   In addition, the information was, in each case, considered confidential by Intelsat, which was the source of the information, and Intelsat had policies protecting confidential information.

62.   Silver Lake and BC Partners obtained the material non-public information pursuant to their agreements with Intelsat and as a result of Svider's and Bateman's positions at Intelsat.

63.   Silver Lake and BC Partners knew, recklessly disregarded, or should have known that they owed a fiduciary duty, or obligation arising from a similar relationship of trust and confidence, to Intelsat to keep the information confidential.

64.   Nevertheless, while in possession of material, non-public adverse information, Defendants sold approximately 10 million shares of Intelsat.

65.   By virtue of the foregoing, all Defendants, and each of them, in connection with the purchase or sale of securities, by the use of the means or instrumentalities of interstate commerce, or of the mails, or a facility of a national securities exchange, directly or indirectly:

   (a)   employed devices, schemes, or artifices to defraud;

   (b)   made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

   (c)   engaged in acts, practices, or courses of business that operated, or would have operated, as a fraud or deceit upon persons.

66.     By virtue of the foregoing, all Defendants, and each of them, directly or indirectly, violated, and unless enjoined, will again violate, §l0(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5 there under, 17 C.F.R. §240.10b-5.

67.     Plaintiff contemporaneously purchased and/or sold securities of the same class as those sold by Defendants BC Partners and Silver Lake.

**SECOND CLAIM**
**Violation of §20A of the Exchange Act**
**(Against All Defendants)**

68.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

69.     This Claim is brought against all Defendants under §20A of the Exchange Act, 15 U.S.C. §78t-1.

70.     Silver Lake and BC Partners knew, recklessly disregarded, or should have known that they had received material, adverse non-public information and that they owed a fiduciary duty, or obligation arising from a similar relationship of trust and confidence, to Intelsat to keep this information confidential.

71.     Nevertheless, while in possession of material, non-public adverse information, Defendants sold approximately 10 million shares of Intelsat.

72.     By virtue of the foregoing, Defendants, in connection with the purchase or sale of securities, by the use of the means or instrumentalities of interstate commerce, or of the mails, or a facility of a national securities exchange, directly or indirectly:

(a)     employed devices, schemes, or artifices to defraud;

(b)     made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

(c)     engaged in acts, practices, or courses of business that operated, or would have operated, as a fraud or deceit upon persons.

73.     Defendants thereby violated §10(b) of the Exchange Act, 15 U.S.C. §78j(b), and SEC Rule 10b-5, 17 C.F.R. §240.10b-5.

74.     Plaintiff contemporaneously purchased and/or sold securities of the same class as those sold by Defendants BC Partners and Silver Lake.

75.     By virtue of the foregoing, Defendants are jointly and severally liable to Plaintiff and the Class for their insider sales pursuant to §20A of the Exchange Act, 15 U.S.C. §78t-1.

**THIRD CLAIM**
**Violation of §20(a) of the Exchange Act**
**(Against All Defendants)**

76.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

77.     This Claim is brought against Defendants for control person liability under §20(a) of the Exchange Act.

78.     Pursuant to §20(a) of the Exchange Act:

Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable . . . , unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

79.     The Defendants named in this count did not act in good faith and directly and/or indirectly induced the wrongful acts complained of herein by:

(a)     permitting the insider sales to occur with actual knowledge or reckless disregard for whether the entities trading possessed material non-public information; or

(b)     failing to adequately supervise their own action in connection with the acquisition of the Inside Information and trading thereon.

80.     By virtue of the foregoing, the Defendants named in this count are jointly and severally liable, pursuant to §20(a) of the Exchange Act, to Plaintiff and the Class with the Defendants liable under the First Claim above.

1

**PRAYER FOR RELIEF**

2  WHEREFORE, Plaintiff demands judgment against Defendants as follows:

3  A. Determining that this action may be maintained as a class action under Fed. R. Civ.

4 P. 23 and certifying Plaintiff as Class Representative;

5  B. Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason

6 of the acts and transactions alleged herein;

7  C. Awarding Plaintiff and the other members of the Class prejudgment and post-

8 judgment interest, as well as their reasonable attorneys' fees, expert fees, and other costs; and

9  D. Awarding such other and further relief as this Court may deem just and proper.

10

**DEMAND FOR TRIAL BY JURY**

11  Pursuant to Fed. R. Civ. P. 38(b), Plaintiff hereby demands trial by jury of all issues that

12 may be so tried.

13 DATED:  April 7, 2020     **SCOTT+SCOTT ATTORNEYS AT LAW LLP**

14        */s/ John T. Jasnoch*

15        JOHN T. JASNOCH (CA 281605)
        600 W. Broadway, Suite 3300

16        San Diego, CA 92101
        Telephone:  619/233-4565

17        619/233-0508 (fax)
        jjasnoch@scott-scott.com

18        THOMAS L. LAUGHLIN, IV
        (*pro hac vice* forthcoming)

19        RHIANA L. SWARTZ
        (*pro hac vice* forthcoming)

20        JONATHAN M. ZIMMERMAN
        (*pro hac vice* forthcoming)

21        **SCOTT+SCOTT ATTORNEYS AT LAW LLP**
        The Helmsley Building

22        230 Park Avenue, 17th Floor
        New York, NY 10169

23        Telephone:  212/233-6444
        212/233-6334 (fax)

24        tlaughlin@scott-scott.com
        rswartz@scott-scott.com

25        jzimmerman@scott-scott.com

26        BRIAN SCHALL (CA 290685)
        **THE SCHALL LAW FIRM**

27        1880 Century Park East, Suite 404
        Los Angeles, CA 90067

28        Telephone:  310/301-3335

1

877/590-0482 (fax)
brian@schallfirm.com

2

3

*Counsel for Plaintiff James Hill*

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CLASS ACTION COMPLAINT

## CERTIFICATION PURSUANT TO THE FEDERAL SECURITIES LAWS

I, James Hill, hereby certify that the following is true and correct to the best of my knowledge, information, and belief:

1.      I have reviewed the Complaint and authorize Scott+Scott Attorneys at Law LLP to file the Complaint and lead plaintiff papers on my behalf.

2.      I am willing to serve as a representative party on behalf of the purchasers of Intelsat S.A. ("Intelsat") securities during the Class Period, including providing testimony at deposition and trial, if necessary.

3.      During the Class Period, I purchased and/or sold the security that is the subject of the Complaint, as set forth in the attached **Schedule A**.

4.      I did not engage in the foregoing transactions at the direction of counsel nor in order to participate in any private action arising under the federal securities laws.

5.      I have not sought to serve as a representative party or lead plaintiff on behalf of a class any private actions arising under the federal securities laws and filed during the three-year period preceding the date on which this certification is signed.

6.      I will not accept any payment for serving as a representative party on behalf of the Class beyond the *pro rata* share of any recovery, except for such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed at    Gardena, CA, USA    . (City, Country)

4/3/2020

Date

James Hill

# Schedule A

**INTELSAT SA**                    **Ticker:   I**            **Cusip:   L5140P101**

Class Period: 11/06/2019 to 11/18/2019

**James Hill**

| | DATE | SHARES | PRICE |
|---|---|---|---|
| Purchases: | 11/6/2019 | 100 | $24.65 |
| | 11/6/2019 | 400 | $24.67 |
| | 11/6/2019 | 425 | $24.07 |
| | 11/6/2019 | 450 | $23.90 |
| | 11/6/2019 | 500 | $24.04 |
| | 11/6/2019 | 500 | $24.11 |
| | 11/6/2019 | 500 | $24.11 |
| | 11/6/2019 | 500 | $24.30 |
| | 11/6/2019 | 500 | $24.61 |
| | 11/6/2019 | 500 | $24.77 |
| | 11/6/2019 | 525 | $23.97 |
| | 11/6/2019 | 550 | $24.04 |
| | 11/8/2019 | 185 | $24.15 |
| | 11/8/2019 | 200 | $24.25 |
| | 11/8/2019 | 115 | $24.35 |
| | 11/8/2019 | 85 | $24.35 |
| | 11/8/2019 | 300 | $24.28 |
| | 11/8/2019 | 300 | $24.32 |
| | 11/8/2019 | 315 | $24.14 |
| | 11/8/2019 | 500 | $23.63 |
| | 11/8/2019 | 500 | $23.74 |
| | 11/8/2019 | 500 | $24.15 |
| | 11/8/2019 | 500 | $24.26 |
| | 11/8/2019 | 500 | $24.28 |
| | 11/8/2019 | 500 | $24.30 |

|  |  | 11/11/2019 | 500 | $23.62 |
|  |  | 11/13/2019 | 200 | $15.40 |
|  |  | 11/13/2019 | 300 | $15.60 |
|  |  | 11/13/2019 | 400 | $15.31 |
|  |  | 11/14/2019 | 100 | $12.76 |
|  |  | 11/14/2019 | 200 | $12.74 |
|  |  | 11/14/2019 | 200 | $13.09 |
|  |  | 11/14/2019 | 300 | $13.12 |
|  |  | 11/14/2019 | 300 | $13.64 |
| **Sales:** | | 11/6/2019 | 450 | $24.37 |
|  |  | 11/7/2019 | 1,000 | $24.38 |
|  |  | 11/7/2019 | 1,645 | $24.36 |
|  |  | 11/7/2019 | 2,000 | $24.47 |
|  |  | 11/7/2019 | 355 | $24.25 |
|  |  | 11/8/2019 | 200 | $24.52 |
|  |  | 11/8/2019 | 300 | $24.54 |