UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE SILVERLAKE GROUP, L.L.C SECURITIES LITIGATION<br><br>This document applies to all actions. | Case No. 20-cv-02341-JSW<br><br>**ORDER GRANTING, IN PART, AND DENYING, IN PART, MOTIONS TO DISMISS AND SETTING DEADLINES AND CASE MANAGEMENT CONFERENCE**<br><br>Re: Dkt. Nos. 115, 119, 128 |

Now before the Court for consideration are motions to dismiss filed by: (1) BC Partners LLP, Serafina S.A., BC European Capital VIII, BC European Capital-Intelsat Co-Investment, BC European Capital-Intelsat Co-Investment 1; CI Management II Limited, LMBO Europe SAS, Raymond Svider ("Svider"), and Justin Bateman ("Bateman") (collectively "BC Partners"); (2) Silver Lake Group, L.L.C., SLP III Investment Holdings S.a.r.l., Silver Lake Partners III, L.P., Silver Lake Technology Investors III, L.P., Silver Lake Technology Associates III, L.P., and STLA III (GP), L.L.C. ("Silver Lake")[1]; and (3) David McGlade ("McGlade). The Court has considered the parties' papers, relevant legal authority, and the record in this case, and the Court HEREBY GRANTS, IN PART, AND DENIES, IN PART, the motions.

---

[1]  Lead Plaintiff alleges that the only entities who held shares in Intelsat were Silver Lake Group, L.L.C. ("Silver Lake Group") and SLP III Investment Holdings S.ar.l ("SLP III"). Lead Plaintiff also alleges that, in an SEC Form 13G filed in 2018, "Silver Lake" alleged that "entities through which Silver Lake held shares in Intelsat may be deemed to share dispositive power over such shares, are members of a group with each other, and are affiliates of each other." (Amended Class Action Complaint ("AC") ¶ 42.) If Lead Plaintiff amends, it shall be prepared to address its theory of how the other four entities could be held liable based on the statements in the Form 13G.

**BACKGROUND**[2]

Walleye Opportunities Master Fund Ltd. and Walleye Manager Opportunities LLC ("Lead Plaintiff") allege Defendants traded stock of Intelsat S.A. ("Intelsat") while in possession of material, non-public information, in violation of Section 10(b) of the Securities Exchange Act (15 U.S.C. section 78j(b)), Rule 15(b) thereunder (17 C.F.R. section 240.10b-5), and section 20A of the Exchange Act (15 U.S.C. section 78t-1).

Silver Lake and BC Partners operate private equity businesses and each owned shares in Intelsat. BC Partners has held shares in Intelsat since 2008, and in 2018 it held over 56 million shares, which represented about 41.1% of Intelsat's outstanding equity. Silver Lake owned over 9.8 million shares as of September 30, 2019. (AC ¶¶ 36-42.) Silver Lake did not have any representatives on Intelsat's Board of Directors, but pursuant to the terms of a Shareholders Agreement between it, BC Partners, and McGlade

> [u]ntil such time as the Silver Lake Investor owns less than 5% of the outstanding Common Stock of [Intelsat], the Silver Lake Investor shall be entitled to receive from [Intelsat] upon reasonable request any information that is required pursuant to any bona fide internal and external reporting or other legal/compliance obligation that the Silver Lake Investor or its direct or indirect shareholders may have, subject to the redaction of any information which in [Intelsat's] good faith judgment (i) is not appropriate to disclose to a Person who does not have a fiduciary duty to [Intelsat] and its shareholders, (ii) the disclosure of which could subject [Intelsat] to risk of liability and (iii) is subject to any attorney-client or other privilege; provided that [Intelsat] shall not share any information that constitutes material non-public or price-sensitive information.

(Dkt. No. 116, Silver Lake Request for Judicial Notice ("RJN") at 3:1-4:21); Dkt. No. 116-1, Declaration of Steven M. Farina ("Farina Decl."), ¶ 1; Dkt. No. 116-2, Farina Decl., Ex. A (Shareholders Agreement, Art. I, § 1.01).)[3] The parties to the Shareholders Agreement also agreed

---

[2] The Court accepts the facts it recites as true for purposes of resolving Defendants' motions.

[3] Lead Plaintiff refers to and relies on the Shareholders Agreement to support its allegation that Silver Lake possessed material, non-public information and used that information in connection with the trades at issue. (See AC ¶¶ 22, 43, 64-65, 123.) Because Lead Plaintiff relies on the terms of the Shareholder Agreement to support essential elements of its insider trading claim and does not dispute the authenticity of the document, the Court considers it under the incorporation-by-reference doctrine. See Khoja v. Orexigen Therapeutics, Inc., 899 F.3d 988, 1002-03 (9th Cir. 2018).

that Intelsat "may from time to time, pursuant to Section 1.01(a), share *confidential*, non-public information about [Intelsat] and any of its subsidiaries with the Silver Lake Investor," subject to confidentiality and other provisions. (*Id.*, Art. I, § 1.02(a)-(c) (emphasis added).)

Svider and Bateman represented BC Partners on Intelsat's Board of Directors. (AC ¶¶ 38-40.) McGlade was the Chairman of Intelsat's Board during the Class Period and, in that role, was "responsible for helping Intelsat cultivate and build strategic partnerships and broader business relationships, government outreach, as well as advising Intelsat's Chief Executive Officer ["CEO"] and senior leadership team on business and policy issues." As of 2018, McGlade held 4,537,793 shares of Intelsat common stock. (*Id.* ¶ 44.)

Intelsat operates a fleet of satellites and provides communications services to customers that transmit content using Intelsat satellites. (*Id.* ¶¶ 4, 50, 53.) To avoid problems that might be caused if multiple broadcasts are transmitted over the same frequency, "broadcasters are given licenses to broadcast at certain frequencies. As such, the right to use a certain band of frequency is valuable and each frequency range has different properties affecting its usefulness for various applications." (*Id.* ¶¶ 4, 51-54.) The Federal Communications Commission ("FCC") allocates licenses that permit broadcasters to use certain frequencies. (*Id.*) A significant portion of Intelsat's business involved broadcasting at a particular frequency range known as the "C-Band." (*Id.* ¶¶ 5, 54.)

In 2017, Intelsat and other satellite broadcasters formed the C-Band Alliance, responding to public discussion about clearing the C-Band in order to repurpose it for the newest generation of cell phone service, *i.e.* "5G". (*See id.* ¶¶ 7, 46, 66.) The C-Band Alliance proposed to "voluntarily vacate the C-Band" and use a private auction to sell "the right to use that spectrum for cell phone service providers." (*Id.* ¶ 67.) Under this private auction proposal, members of the C-Band Alliance, including Intelsat, would keep the profits. If the FCC accepted the C-Band Alliance's proposal, an auction could generate upwards of $60 billion, and "one analyst estimat[ed] Intelsat's market capitalization would increase by 770%." (*Id.* ¶¶ 7, 68.) However, if the FCC conducted a public auction, the FCC "would take Intelsat's licenses, conduct the auction itself, and remit most or all of the proceeds to the U.S. Treasury." (*Id.* ¶¶ 8, 69.)

Lead Plaintiff alleges that one of Intelsat's former Vice Presidents ("CW-1"), Intelsat's CEO Stephen Spengler ("Spengler"), and other senior executives were part of a small working group focused on the C-Band auction and negotiations with the FCC. (*Id.* ¶ 48.)[4] Initially, the FCC appeared ready to adopt the C-Band Alliance's proposal. For example, CW-1 stated that "the FCC had been giving Intelsat 'all the right body language' to indicate it was likely to support Intelsat's plan." CW-1 also stated that Spengler believed he had a "handshake deal" with FCC Chairman Ajit Pai ("Chairman Pai") about the auction. (*See id.* ¶¶ 9-10, 12-13. 70-72, 78.)

Analysts at Evercore, Morgan Stanley, and JPMorgan also issued statements suggesting the FCC was likely to allow a private auction. On November 4, 2019, Jeffries reported that it was "bullish" on the C-band deal and "reiterated [the] suggestion to buy Intelsat stock, based on the prospect of the" C-Band Alliance's proposal being accepted. (*Id.* ¶¶ 71-72.) Despite these optimistic signs, public and political opposition to a private auction began in early 2019. (*See, e.g.,* Dkt. No. 120, BC Partners' RJN, at 2 ¶ 4; Dkt. No. 121-1 Declaration of Morgan E. Whitworth ("Whitworth Decl."), ¶ 5; Dkt. No. 121-4, Whitworth Decl., Ex. D ("Lawmakers Leery of Satellite Companies' 5G Airwaves Plan", *Bloomberg Law,* Mar. 5, 2019).)[5]

According to CW-1, in late October 2019 things "started to get weird." (AC ¶ 73.) There were rumors that Senator John Kennedy of Louisiana was meeting with Chairman Pai as well as the President. (*Id.* ¶¶ 11, 13, 48, 73-74; *see also* BC Partners' RJN at 2, ¶ 5; Whitworth Decl., ¶ 6; Dkt. No. 121-5, Whitworth Decl., Ex. E ("Senator Pushes for FCC, not satellite operators, to run C-Band auction," *Space News*, Oct. 18, 2019).)[6] In late October, Congress also introduced a bill

---

[4]  Lead Plaintiff relies on information provided by two confidential witnesses ("CW-1" and "CW-2"). CW-1 was employed by Intelsat for several years prior to and throughout the Class Period. CW-2 was a senior executive at the C-Band Alliance throughout 2019 and is alleged to have worked closely with Intelsat's senior management of Intelsat and SES, another C-Band Alliance member, in connection with the C-Band Alliance's proposals. (AC ¶ 49.)

[5]  The Court takes judicial notice of the existence of this article and the fact that it includes statements that Senator Kennedy indicated he was in favor of a public auction. *Khoja*, 899 F.3d at 999. The Court does not take judicial notice of the truth of those facts. *Id.*

[6]  An article published on November 1, 2019 in *Law360.com* reports that Senator Kennedy's office confirmed he had raised the issue with the President in a phone call. (BC Partners' RJN at 3 ¶ 8; Whitworth Decl., ¶ 9; Dkt. No. 121-8, Whitworth Decl., Ex. H.) According to Lead Plaintiff, *Reuters* published an article, which reported the President called Chairman Pai about the issue.

to require a public auction rather than a private auction. (BC Partners' RJN at 2 ¶ 6; Whitworth Decl., ¶ 7; Dkt. No. 121-6, Whitworth Decl., Ex. F; *see also* BC Partners' RJN at 3 ¶ 7; Whitworth Decl., ¶ 8; Dkt. No. 121-7, Whitworth Decl., Ex. G ("House lawmakers, with legislation in tow, push for public C-band auction", *Space News*, Oct. 30, 2019).)[7]

"Chairman Pai's position on [the] issue was critical, as the other 4 commissioners were split along party lines." (*Id.* ¶ 74.) On November 4, 2019, Spengler and SES's CEO requested a meeting with the FCC, "[i]n a clear reaction to the intense interest within Intelsat as to the possibility of Senator Kennedy persuading Chairman Pai to reject the plan." (*Id.* ¶ 75.) That meeting took place on November 5, 2019 (the "November 5 meeting"). Before the November 5 meeting, Nicholas Degani, Chairman Pai's Senior Counsel, emailed Chairman Pai and said "'so…given where we are, I assume I'd play it cold, no?' Chairman Pai responded and approved of this strategy." (*Id.* ¶ 76.) Spengler, SES's CEO, and Mr. Degani attended the November 5 meeting. (*Id.* ¶¶ 14, 77-78.) CW-2 reported that Peter Pitsch, Head of Advocacy and Government Relations for the C-Band Alliance, also attended the meeting. (*Id.* ¶ 80.) Mr. Pitsch is not listed among the attendees in a public notice filed after the meeting occurred. (Dkt. No. 130, McGlade RJN at 6:26-7:21; Dkt. No. 129, Declaration of Andrew J. Frantela ("Frantela Decl."), ¶ 9; Dkt. No. 129-9, Frantela Decl., Ex. I.)

CW-1 did not attend the November 5 meeting but met with Spengler after that meeting. Spengler allegedly told CW-1 "that the meeting had confirmed the rumors that the FCC was leaning toward going with Senator Kennedy's approach." (AC ¶¶ 15, 79.) CW-2 also reported they were told FCC officials indicated it was changing direction and would push for a public auction, rather than adopting the C-Band Alliance's proposal for a private auction.[8] CW-2 also did not attend the November 5 meeting but stated that Spengler went to the C-Band Alliance's

---

(AC ¶ 74 & n.7.)

[7] The Court takes judicial notice of the existence of the press release and the article announcing that legislation had been introduced and of the fact that statements were made that Congress was pushing for a public auction. *Khoja*, 899 F.3d at 999. The Court does not take judicial notice of the truth of those facts. *Id.*

[8] The Court has chosen to use gender neutral pronouns to refer to the CWs.

offices after the meeting to debrief CW-2 and others. CW-2 also recalled speaking with Pitsch about what had happened at the November 5 meeting. According to CW-2 "the meeting had gone poorly and … the messaging from the FCC was negative" and the plan was to try to get things "back on track" so the FCC would not reject the private auction proposal. (*Id.* ¶ 80.) According to CW-1 and CW-2, after the November 5 meeting, Intelsat began to work on a revised proposal that would provide for Intelsat to make voluntary contributions to the U.S. Treasury based on the proceeds of the auction. (*Id.* ¶¶ 83-87.)

Lead Plaintiff alleges that immediately after the November 5 meeting, McGlade, BC Partners, and Silver Lake sold $246 million in stock through a private block sale conducted by Morgan Stanley. (*Id.* ¶¶ 20-24; *see also id.* ¶¶ 36-37, 41, 55-65, 88-93.) According to an article in the *New York Post,* "[t]here was no advance warning that the sale was coming, and interested buyers were told they had an hour or so to decide." (*Id.* ¶ 89.) The sale represented approximately 14% of Defendants' holdings in Intelsat. (*Id.* ¶ 131.)

On November 8, 2019, two *ex parte* communications from the C-Band Alliance were posted on the FCC's website. The first reported the fact of the November 5 meeting. The second disclosed the C-Band Alliance's proposal to provide for voluntary payments to the U.S. Treasury. (*Id.* ¶¶ 26 94-95; *see also* Frantela Decl., Ex I; Frantela Decl., ¶ 11; Dkt. No. 129-11, Frantela Decl., Ex. K.) Intelsat's stock closed 9% below the price it had closed on November 5, 2019. (AC ¶¶ 26, 96.) Between November 8 and November 19, "information continued to leak into the market regarding the decreased prospects" of the private auction. On November 18, 2019, the FCC announced it would hold a public auction and Intelsat's stock price declined by about 40%, 70% lower than it closed on November 5, 2019. (*Id.* ¶¶ 26-27, 97-105.) On February 20, 2020, the FCC voted 3-2 to reject the C-Band Alliance's proposal and to adopt a public auction. On May 14, 2020, Intelsat filed for bankruptcy. (*Id.* ¶ 28; *see also id.* ¶¶ 106-110.)

The Court will address additional facts as necessary in the analysis.

//

//

//

6

# ANALYSIS

## A. Applicable Pleading Standards.

Defendants move to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). Under Rule 12(b)(6), a court generally "is limited to the allegations in the complaint, which are accepted as true and construed in the light most favorable to the plaintiff." *Lazy Y Ranch LTD v. Behrens*, 546 F.3d 580, 588 (9th Cir. 2008). However, a court may consider "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007) ("*Tellabs*").

Even under the liberal pleadings standard of Federal Rule of Civil Procedure 8(a)(2), "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a claim for relief will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). Pursuant to *Twombly*, a plaintiff must not allege conduct that is conceivable but must allege "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570. "A claim has facial plausibility when the Plaintiff pleads factual content that allows the court to draw the reasonable inference that the Defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).

Claims sounding in fraud or mistake are subject to heightened pleading requirements, which require that a plaintiff claiming fraud "must state with particularity the circumstances regarding fraud or mistake." Fed. R. Civ. P. 9(b). Accordingly, "[a]verments of fraud must be accompanied by 'the who, what, when, where, and how' of the misconduct charged." *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1107 (9th Cir. 2003) (quoting *Cooper v. Pickett*, 137 F.3d 616, 627 (9th Cir. 1997)).

When a plaintiff brings a claim for violations of Rule 10(b)(5), they "must meet both the heightened pleading requirements" of Rule 9(b) and "'the exacting pleading requirements' … of the Private Securities Litigation Reform Act ("PSLRA")." *In re Quality Sys. Inc. Sec. Litig.*, 865

F.3d 1130, 1140 (9th Cir. 2017) (quoting *Tellabs*, 551 U.S. at 313).[9] One requirement is that a plaintiff must "state with particularity facts giving rise to a strong inference that [a] defendant acted with the required state of mind." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 991 (9th Cir. 2009) (quoting 15 U.S.C. § 78u-4(b)(2)). Because Lead Plaintiff relies on confidential witnesses, it must "pass two additional hurdles." *Zucco Partners*, 552 F.3d at 995. "First, the confidential witnesses whose statements are introduced to establish scienter must be described with sufficient particularity to establish their reliability and personal knowledge." *Id.* "Second, … statements which are reported by confidential witnesses with sufficient reliability and personal knowledge must themselves be indicative of scienter." *Id.* (citation omitted).

**B.  The Court Dismisses Lead Plaintiff's Insider Trading Claim, With Leave to Amend.**

**1.  Lead Plaintiff Sufficiently Alleges It Has Statutory Standing.**

BC Partners and Mc Glade argue that Lead Plaintiff lacks statutory standing to pursue its claims. "[T]he Ninth Circuit [has] adopted a contemporaneous trading requirement for Section 10(b) and Rule 10b-5 actions" but has not adopted a clear definition of the term "contemporaneous." *Brody v. Transnat'l Hosps. Corp.*, 280 F.3d 997, 1001 (9th Cir. 2002) (citing *Neubronner v. Milken*, 6 F.3d 666, 669 (9th Cir. 1993)). In *Brody,* the court concluded that to allow the plaintiffs to proceed based on trades that took place two months after the defendants' trades "would gut the contemporaneous trading rule's premise – that there is a need to filter out plaintiffs who could not possibly have traded with the insider, given the manner in which public trades are transacted." 280 F.3d at 1002. Other courts have found trades that occurred within a few days of an alleged insider trade were sufficiently contemporaneous to state a claim. *See, e.g., Evanston Police Pension Fund v. McKesson Corp.*, 411 F. Supp. 3d 580, 606 (N.D. Cal. 2019).

The Court is not persuaded by Defendants' argument that Lead Plaintiff lacks standing because it does not allege it bought Intelsat stock in the block sale. Defendants rely, in part, on *Buban v. O'Brien*, in which the court held that trades occurring three days after the defendant

---

[9] The pleading requirements for Lead Plaintiff's Section 10(b) and 20(a) claims are the same. *See, e.g., City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 623 (9th Cir. 2017) (hereinafter "*Dearborn Heights*").

traded shares were not sufficiently contemporaneous. That court reasoned "the market had already absorbed defendant's shares prior to plaintiff's purchase of the stock," precluding a conclusion that the plaintiff traded at an informational disadvantage with the defendant. No. 94-cv-03331-FMS, 1994 WL 324093, at *3-4 (N.D. Cal. June 22, 1994). Defendants also rely on *SEB Investment Management AB v. Align Technology, Inc.*, 485 F. Supp. 3d 1113 (N.D. Cal. 2020). In that case many of the plaintiff's trades took place *before* the alleged inside trades or were made at a price below the defendant's sales price. *Id.* at 1136 ("courts have consistently held that shares purchased below the defendant's sale price cannot satisfy the contemporaneity requirement because it is impossible that those trades occurred with defendant at an unfair advantage).

The contemporaneous trading rule does serve as a proxy for contractual privity. *See, e.g., In re AST Res. Sec. Litig.*, 887 F. Supp. 231, 234 (C.D. Cal. 1995). However, as even *Buban* and *SEB* recognize, it also serves to ensure "that only private parties who have traded with someone *who had an unfair advantage* will be able to maintain insider trading claims." *Neubronner,* 6 F.3d at 670 (emphasis added); *cf. Shapiro v. Merrill, Lynch, Pierce Fenner & Smith, Inc.*, 495 F.2d 228, 237 (2nd Cir. 1974) ("To hold that Section 10(b) and Rule 10b-5 impose a duty to disclose material inside information only in face-to-face transactions or to the actual purchasers or sellers on an anonymous public stock exchange, would be to frustrate a major purpose of the antifraud provisions of the securities laws: to insure the integrity and efficiency of the securities markets."); *Turocy v. El Pollo Loco Holdings, Inc.,* No. SA CV 15-1343-DOC (KESx), 2018 WL 3343493, at *14-16 (C.D. Cal. July 3, 2018) (considering block sale when evaluating whether trades were contemporaneous); *Johnson v. Aljian*, 257 F.R.D. 587, 594-95 (C.D. Cal. 2009) (on motion for class certification, court included defendant's private trades to analyze whether plaintiffs' trades were sufficiently contemporaneous) ("*Johnson III*").[10]

Although the *Turocy* court addressed the issue in connection with a motion for class certification and did not "fully resolve whether a private trade can ever be excluded from the

---

[10] According to the legislative history of Section 20A, the drafters intended the term "contemporaneous" to have the meaning "which has developed through the case law," citing to, *inter alia*, *Shapiro*. H.R. Rep. No. 910, at 27 & n.22 (1988), reprinted in 1988 U.S.C.C.A.N. 6043, 6064.

9

contemporaneous trading analysis," the Court finds its reasoning persuasive. *Turocy*, 2018 WL 3343493, at *13. The word "contemporaneous" is a "temporal word meaning existing, occurring, or originating during the same time." *Id.*, at *14 (internal citation and quotations omitted). Citing cases where trades "several days apart" were considered contemporaneous, the court reasoned that, in those circumstances, "it would be impossible (or at least very unlikely) for such investors to have traded directly with the inside trader." *Id.* (citing cases). The court also reasoned that none of the cases cited by Congress in Section 20A's legislative history suggested direct trades were required. The court noted that *Shapiro,* in particular, held that "privity between plaintiffs and defendants is not a requisite element of a Rule 10b-5 cause of action for damages." *Id.* at *16 (quoting *Shapiro*, 495 F.2d at 237). Finally, the court noted support for the proposition that "inside traders should not be able to avoid Section 20A liability by trading with private counterparties." *Id.*; *see also Johnson III*, 257 F.R.D. at 593 (rejecting similar argument because "all a person would need to do avoid liability under § 20A would be to runnel [*sic*] sales of shares through a broker").

Here, Lead Plaintiff alleges it purchased Intelsat stock on each business day from November 5, 2019, the day of Defendants' trade, through November 18, 2019. (AC ¶¶ 141-143.) The Court does not address which of Lead Plaintiff's trades could be considered the outer limit of contemporaneous, but it concludes Lead Plaintiff's allegations of trades on, at the very least, November 5th and 6th are sufficient to plead contemporaneous trades. Those allegations "address[] the need for a period that both serves as a legitimate proxy for the privity requirement and [could set] a reasonable limit on" Defendants' exposure. *Johnson III,* 257 F.R.D. at 595; *see also Thomas v. Magnachip Semiconductor Corp.*, 167 F. Supp. 3d 1029, 1049 (N.D. Cal. 2016) (finding trade the day after alleged inside trade was contemporaneous).

Accordingly, the Court DENIES, IN PART, Defendants' motion to dismiss.

### 2. Lead Plaintiff's Allegations of Insider Trading are Insufficient.

Lead Plaintiff alleges claims for insider trading under Section 10(b) and Section 20A. In order to state a claim under Section 10b for insider trading, Lead Plaintiff must allege the Defendants owed a fiduciary duty to Intelsat stockholders, traded shares in Intelsat on the basis of

10

material, non-public information, and acted with scienter. *See, e.g., S.E.C. v. Talbot*, 530 F.3d 1085, 1091-92 (9th Cir. 2008).[11]

Section 20A provides that "[a]ny person who violates any provision of this chapter or the rules or regulations thereunder by purchasing or selling a security while in possession of material, nonpublic information shall be liable in an action in any court of competent jurisdiction to any person who, contemporaneously with the purchase or sale of securities that is the subject of such violation, has purchased (where such violation is based on a sale of securities) or sold (where such violation is based on a purchase of securities) securities of the same class." 15 U.S.C. § 78t-1(a). In order to state a claim under Section 20A, Lead Plaintiff must allege a predicate violation of Section 10(b). *See Johnson v. Aljian*, 490 F.3d 778, 781 (9th Cir. 2007) ("*Johnson II*").

Lead Plaintiff must plead specific facts to show what information Defendants learned and how and when they learned it. *See Neubronner*, 6 F.3d at 672. Lead Plaintiff also must plead scienter with sufficient particularity. Scienter is defined as "a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976). To act with scienter, Defendants must have acted intentionally or with deliberate recklessness. *Zucco*, 552 F.3d at 991. Deliberate recklessness means that the reckless conduct "reflects some degree of intentional or conscious misconduct." *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 782 (9th Cir. 2008).

The scienter inquiry is "inherently comparative." *Tellabs*, 551 U.S. at 323. An inference of scienter is "strong" for purposes of dismissal "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* (quoting *Tellabs*, 551 U.S. at 324). When it evaluates allegations of

---

[11] There are two theories of insider trading. The first is "the traditional or classical theory that insiders have a duty to disclose or abstain from trading because of the necessity of preventing a corporate insider from taking unfair advantage of uninformed stockholders." *United States v. O'Hagan,* 521 U.S. 642, 651-52 (1997) (internal quotations and alterations omitted, quoting *Chiarella v. United States*, 445 U.S. 222, 228-29 (1980)). The second is the "misappropriation theory," *i.e.* the theory "that a person commits fraud ... when he misappropriates confidential information in breach of a duty owed to the source of the information." *Id.* at 652. Although Silver Lake disputes Lead Plaintiff's characterization that it was an insider, Defendants have not argued they lacked a fiduciary duty to Intelsat shareholders.

scienter, the Court must "compare the malicious and innocent inferences cognizable from the facts pled in the complaint" and only allow the claims "if the malicious inference is at least as compelling as any opposing innocent inference." *Zucco*, 552 F.3d at 991 (citing *Tellabs*, 551 U.S. at 323); *see also In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1052 (9th Cir. 2014) ("[I]n determining whether the pleaded facts give rise to a strong inference of scienter, the court must take into account plausible opposing inference[s].") (quoting *Tellabs*, 551 U.S. at 322-23).

The parties dispute whether Lead Plaintiff must also show that Defendants actually used the information, an issue the Ninth Circuit has not fully resolved in the context of civil insider trading cases. In *United States v. Smith*, the Ninth Circuit concluded the government must prove actual use in a criminal prosecution for insider trading. 155 F.3d 1051, 1067-69 (9th Cir. 1988.) District courts within the Ninth Circuit are divided about whether actual use is required to state a civil claim. In *In re Countrywide Financial Corporation Securities Litigation*, the court reasoned an actual use standard, subject to *Tellabs* balancing, was the only standard that would satisfy "the PSLRA and the Ninth Circuit's demanding deliberate recklessness or actual knowledge or intent standards." 588 F. Supp. 2d 1132, 1203 n. 82 (C.D. Cal. 2008). That court also rejected a "presumption that knowledge triggers an actual-use inference" because it could not "reconcile that presumption with *Tellabs* balancing and *South Ferry's* astute observation that, after *Tellabs*, courts cannot establish categorical presumptions in PSLRA analyses." *Id.*

In contrast, in *SEC v. Moshayedi*, the court noted that Rule 10b-5, which was promulgated after *Smith* was decided, defines "on the basis of" to mean that "the person making the purchase or sale was aware of the material nonpublic information when the person made the purchase or sale." No. SACV 12-01179 JVS (ANx), 2013 WL 12172131, at 14 (C.D. Cal. Sept. 23, 2013) (quoting 17 C.F.R. § 240.10b5-1(b)). The court deferred to the SEC's construction of the term "on the basis of" and concluded the SEC would be required to show the defendant possessed or was aware of material, non-public information to prevail on its claim. *Id.* In *Johnson v. Aljian*, the court also declined to apply *Smith*'s actual use standard in connection with the plaintiff's insider trading claim under Section 10b-5. 394 F. Supp. 2d 1198-99 (C.D. Cal. 2004) ("*Johnson I*"). Instead, it followed *SEC v. Adler*, cited with approval in *Smith*, "which held that although knowing

12

possession of insider information is not a per se violation, when an insider trades while in possession of material, nonpublic information, a strong inference arises that such information was used by the insider in trading." *Id.* (citing *Adler*, 137 F.3d 1325, 1337-39 (11th Cir. 1998)); *see also Thomas*, 167 F. Supp. 3d at 1050 (following *Johnson I* and *United States v. Teicher*, 987 F.2d 112, 120 (2d Cir. 1993) and declining to apply actual use standard). The Court finds the reasoning of the latter cases persuasive, especially in light of Rule 10b-5's definition of "on the basis of." If Lead Plaintiff can show a Defendant possessed material, non-public information at the time of the block sale, the Court will use that as a factor in its evaluation of scienter. *Cf. Dearborn Heights*, 865 F.3d at 619-20 ("actual access to disputed information may raise a strong inference of scienter").[12]

Lead Plaintiff alleges that, at the time of the block sale, (1) the fact that the November 5 meeting took place, (2) that Intelsat learned the FCC reversed its position on a private auction, and (3) the revisions to Intelsat's proposal were material and non-public. (AC ¶ 111.) Lead Plaintiff argues that the information provided by the CWs, the importance of the C-Band auction to Intelsat, Defendants' right to access information, either by their positions on Intelsat's Board or pursuant to the Shareholders Agreement, and the timing of the block trade all give rise to the reasonable inference Defendants learned that information before they initiated the block trade.

Although CW-2 states that Intelsat kept the Board apprised of the progress of the C-Band auction project and negotiations with the FCC, their statements also suggest that Intelsat kept the Board informed through regular Board meetings. (*See* AC ¶¶ 24, 118-119.) CW-1 and CW-2 do not state that Intelsat called any emergency board meetings following the November 5 meeting. They also do not point any other communications by Spengler to the Board on that day, let alone the content of any such communications. The CWs also concede they had no specific information about the block trade. Instead, they merely surmise Intelsat would have updated the Board. (*See,*

---

[12] The scienter analysis requires the Court to engage in a dual inquiry, in which it first inquires whether any of the "allegations, standing alone, is sufficient to create a strong inference of scienter." *NVIDIA*, 768 F.3d at 1056. If none of the allegations alone are sufficient, the Court then "consider[s] the allegations holistically to determine whether they create a strong inference of scienter taking together." *Id.*

13

*e.g.*, AC ¶¶ 85 ("Board was likely kept in the loop"), 92 (stating, without factual support, it was "obvious" Board was updated).)

Lead Plaintiff does describe the CWs positions and their involvement with the C-Band project in sufficient detail to establish they would be in a position to know about the meeting and about the revisions to Intelsat's proposal. *See Zucco*, 552 F.3d at 995. Lead Plaintiff also includes facts that show CW-1 and CW-2 received information about Intelsat's reactions to the November 5 meeting. However, only CW-1 recounted what they were told. (AC ¶ 15.) In the face of Chairman Pai's sworn testimony, the Court concludes the CW's allegations are not sufficiently reliable to support a strong inference that the FCC disclosed material, non-public information during the November 5 meeting. *See, e.g., Zucco*, 552 F.3d at 997 ("[V]ague hearsay … is not enough to satisfy [the] reliability standard.")

Bateman and Svider sat on Intelsat's Board as BC Partners' representatives. Silver Lake, however, was not represented on the Board and the terms of the Shareholder Agreement cut against Lead Plaintiff's allegations that Intelsat would have shared information it considered *material*, non-public information with Silver Lake. (Shareholder Agreement, Art. I, § 1.01(a).) Lead Plaintiff also relies on the fact that, according to CW-1, Intelsat had not instituted an information black-out at the time of the trade to argue it is reasonable to infer that information would have been flowing freely to the Board at the time of the block trade. Another inference to be drawn from that fact is that Intelsat did not believe it received material non-public information at the November 5 meeting.

Lead Plaintiff also alleges that Intelsat was dangerously indebted, and Defendants do not challenge Lead Plaintiff's allegations that the C-Band Auction would have a significant financial impact on Intelsat's overall financial condition. (*See, e.g.,* AC ¶¶ 55-58.) To the extent Lead Plaintiff relies on the "core operations" theory to support its allegations of knowledge and scienter, none of the Defendants were members of Intelsat's management during the Class Period. Lead Plaintiff also does not include any information to suggest that the Defendants were intimately aware of and monitored the C-Band proceedings. *Cf. Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1068 (9th Cir. 2008) ("As this court has noted on more than one occasion,

corporate management's general awareness of the day-to-day workings of the company's business does not establish scienter – at least absent some additional allegation of specific information conveyed to management and related to the fraud.").

Lead Plaintiff also relies on the timing of the block sale and the amount of stock sold in the block sale, which can be probative of scienter. *See, e.g., In re Silicon Graphics, Inc. Sec. Litig.*, 183 F.3d 970, 987 (9th Cir. 1999). Among the factors a court considers, are: "(1) the amount and percentage of shares sold by insiders; (2) the timing of the sales; and (3) whether the sales were consistent with the insider's prior trading history." *Id.* The fact that the block sale took place shortly after the November 5 meeting and without notice are compelling facts.[13] However, the block trade also took place shortly after Intelsat's earnings announcement for third-quarter 2019. (BC Partners RJN at 3:10-12; Whitworth Decl., ¶10; Dkt. No. 121-9 (Intelsat SEC Form 6-K, Ex. 99.1 at 2 (discussing C-Band proceeding at FCC).)

Lead Plaintiff also fails to include sufficient allegations from which the Court can infer the block sale was "dramatically out of line with [Defendants'] prior trading practices." *In re Silicon Graphics,* 183 F.3d at 987; *cf. S.E.C. v. Truong,* 98 F. Supp. 2d 1086, 1097 (N.D. Cal. 2000) ("Suspicious trading by itself cannot suffice to warrant an inference that an alleged tipper, the first link on the information chain, traded on the basis of material non-public information."). For example, Silver Lake and McGlade had tag-along rights to participate in a sale instituted by BC Partners. The record shows that Silver Lake had been selling down shares prior to the block trade. (Farina Decl.,¶¶ 2-6; Dkt. Nos. 116-3 through 116-7, Farina Decl., Exs. B-E.) Lead Plaintiff has also alleged that "things began to get weird" in October 2019. Although analysts were optimistic about the prospects of a private auction and although Intelsat continued to view prospects positively, in early 2019 there were reports of opposition to a public auction, which began to increase in late October. Defendants also point to the fact that they still held stock after the FCC's announcement and suffered significant losses. These facts cut against an inference that

---

[13] The Court concludes Lead Plaintiff's allegations regarding Silver Lake's allegedly suspicious sale of Solar Winds stock in 2015 does not alter the analysis. *See, e.g., Kyung Cho v. UCBH Holdings, Inc.*, 890 F. Supp. 2d 1190, 1203 (N.D. Cal. 2012).

Defendants were acting to "maximize the personal benefit from undisclosed inside information." *In re Silicon Graphics*, 183 F.3d at 986.

The Court concludes that Lead Plaintiff has failed to sufficiently allege that Defendants possessed material non-public information and that it has failed to allege sufficient facts to show Defendants acted with scienter. Accordingly, the Court GRANTS Defendants' motions to dismiss. Because the Court cannot say it would be futile, the Court will grant Lead Plaintiff leave to amend.

### C.   The Court Dismisses the Section 20(a) Claim.

Lead Plaintiff alleges Svider and Bateman violated Section 20(a), which creates joint and several liability for the "control person" who "directly or indirectly, controls any person liable under any provision of [the Exchange Act] or any rule or regulation thereunder . . . to the same extent as such controlled person to any person to whom such controlled personal is liable . . . ." 15 U.S.C. § 78t(a). Because the Court concludes Lead Plaintiffs have failed to state a claim under Section 10(b), the Court concludes they fail to state a claim under Section 20(a). *Dearborn Heights*, 856 F.3d at 623 ("without 'a primary violation of federal securities law,' Plaintiff cannot establish control person liability").

Accordingly, the Court GRANTS Defendants' motion to dismiss this claim, with leave to amend.

### CONCLUSION

For the foregoing reasons, the Court GRANTS, IN PART, AND DENIES, IN PART, Defendants' motions to dismiss. Because the Court cannot say it would be futile, it GRANTS Lead Plaintiffs' leave to file a second amended complaint by no later than October 28, 2022. Defendants shall answer or otherwise respond thirty days after an amended complaint is filed.

//

//

//

//

//

If Lead Plaintiff amends, the Court ORDERS the parties to appear for a case management conference on January 6, 2023 at 11:00 a.m.  The parties shall file a joint case management conference statement on or before December 30, 2022.

**IT IS SO ORDERED.**

Dated: September 27, 2022

_____
JEFFREY S. WHITE
United States District Judge

17