**LABATON SUCHAROW LLP**
Carol C. Villegas (admitted *pro hac vice*)
David J. Schwartz (admitted *pro hac vice*)
Jake Bissell-Linsk (admitted *pro hac vice*)
140 Broadway
New York, NY 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
Email: cvillegas@labaton.com
Email: dschwartz@labaton.com
Email: jbissell-linsk@labaton.com

*Counsel for Lead Plaintiff the Walleye Group and Lead Counsel for the Proposed Class*

**WAGSTAFFE, VON LOEWENFELDT, BUSCH & RADWICK LLP**
100 Pine Street, Suite 725
James M. Wagstaffe (#95535)
Frank Busch (#258288)
San Francisco, CA 94111
Telephone: (415) 357-8900
Facsimile: (415) 357-8910
Email: wagstaffe@wvbrlaw.com
Email: busch@wvbrlaw.com

*Liaison Counsel for Lead Plaintiff the Walleye Group and Lead Counsel for the Proposed Class*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **IN RE SILVER LAKE GROUP, L.L.C. SECURITIES LITIGATION** | **Case No: 4:2020-cv-02341-JSW**<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

# TABLE OF CONTENTS

Page


I. INTRODUCTION ....... 2
II. SUMMARY OF THE CASE ....... 3
- A. The Bet-the-Company Deal ....... 3
- B. The November 5, 2019, FCC Meeting ....... 5
- C. The Insider Sales Immediately Following the November 5, 2019 Meeting ....... 9
- D. The Collapse ....... 12

III. JURISDICTION AND VENUE ....... 14
IV. PARTIES AND RELEVANT PERSONS ....... 14
- A. Lead Plaintiff ....... 14
- B. Defendants ....... 14
- C. Other Relevant Persons, Entities and Witnesses ....... 17

V. SUBSTANTIVE ALLEGATIONS ....... 18
- A. History of Intelsat's Business and C-Band ....... 18
- B. History of Intelsat's Involvement with Silver Lake and BC Partners ....... 19
- C. The Bet-the-Company Plan for a Private C-Band Auction ....... 22
- D. The Lead-up to the Meeting with the FCC ....... 24
- E. The FCC Meeting ....... 24
- F. Intelsat Works on a Revised Private Auction Proposal ....... 31
- G. The Insider Stock Sales ....... 33
- H. The Truth is Revealed and Intelsat Collapses ....... 36

VI. ALLEGATIONS SUPPORTING SCIENTER ....... 42
- A. Materiality and Free Flow of Information ....... 42
- B. Timing and Manner of the Trades ....... 46
- C. Historical Trading ....... 47

VII. LOSS CAUSATION ....... 47

VIII. CONTEMPORANEOUS TRADING....48

IX. APPLICATION OF PRESUMPTION OF RELIANCE....49

X. CLASS ACTION ALLEGATIONS....50

XI. COUNTS....53

A. COUNT I: Violation of § 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against Defendants McGlade, Silver Lake, and BC Partners....53

B. COUNT II: Violation of § 20A of the Exchange Act Against Defendants McGlade, and Silver Lake, and BC Partners....54

C. COUNT III: Violation of § 20(a) of the Exchange Act Against Defendants Svider and Bateman....55

XII. PRAYER FOR RELIEF....56

XIII. DEMAND FOR TRIAL BY JURY....57

By and through their undersigned counsel, Walleye Opportunities Master Fund Ltd. and Walleye Manager Opportunities LLC, ("Walleye Group" or "Lead Plaintiff"), bring this complaint individually, and on behalf of a class of similarly situated persons, against the following sixteen Defendants: BC Partners LLP; Serafina S.A.; BC European Capital VIII; BC European Capital-Intelsat Co-Investment; BC European Capital-Intelsat Co-Investment 1; CIE Management II Limited; LMBO Europe SAS (together, "BC Partners"); Silver Lake Group, L.L.C.; SLP III Investment Holdings S.à r.l.; Silver Lake Partners III, L.P.; Silver Lake Technology Investors III, L.P.; Silver Lake Technology Associates III, L.P.; SLTA III (GP), L.L.C. (together, "Silver Lake"); Raymond Svider; Justin Bateman; David McGlade (together, the "Individual Defendants"). This action involves Defendants' insider trading in the stock of Intelsat S.A. ("Intelsat" or the "Company").

Lead Plaintiff alleges the following upon personal knowledge as to those allegations concerning Lead Plaintiff and, as to all other matters, upon the investigation of counsel, which included, without limitation: (a) review and analysis of public filings made by Defendants with the U.S. Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications, including those disseminated by certain of the Defendants and other related non-parties; (c) review of news articles; (d) interviews with former employees of Intelsat, its affiliates, and other third parties; (e) review of emails from individuals at Morgan Stanley and the United States Federal Communications Commission ("FCC"); (f) consultation with individuals with expertise in insider trading; and (g) review of bankruptcy court filings.

Lead Plaintiff believes that substantial additional evidentiary support exists for the allegations herein that will be revealed after Lead Plaintiff has a reasonable opportunity to conduct discovery and complete its investigation.

As more fully stated herein, Lead Plaintiff brings this federal securities class action on behalf of itself and investors who purchased Intelsat common stock on or around November 5, 2019 through November 18, 2019 (inclusive, the "Class Period"), which includes investors who purchased contemporaneously with Defendants' sales on or around November 5, 2019.

## I. INTRODUCTION

1. This is the quintessential insider trading case. Intelsat, a satellite operator, was successfully pursuing a bet-the-Company-deal with the FCC. Its Board Chairman, Defendant David McGlade, and its two largest shareholders, Defendants BC Partners and Silver Lake, sold $246 million in stock, the very same day they learned the FCC was turning against the deal.

2. In a Senate Appropriations Committee hearing on June 16, 2020, Senator John Kennedy (of Louisiana) questioned FCC Chairman Ajit Pai about the allegations set forth in the initial complaint in this action (ECF No. 1). The following excerpt of Senator Kennedy's statements provides a cogent synopsis of the allegations at issue in this action:

> [T]he original proposal by the foreign satellite companies . . . was to seek permission from the FCC for them to conduct the auction and allocate the C-Band and allow them, the foreign satellite companies, to keep the proceeds of the auction . . . And it was clear to me at one point, the FCC was inclined to go along with it.
>
> * * *
>
> [O]ne of the foreign satellite companies, I think it would be accurate to call it the lead dog, Intelsat, its stock went through the roof. . . . On November 5th, 2019, the CEO of Intelsat met with one of [the FCC's] senior lawyers, [and] . . . two of the biggest Intelsat shareholders sold $246 million of their own stock. Shortly thereafter, the FCC announced that it was going to conduct a public auction . . . And the price of Intelsat stock dropped more than 75% from like 25 bucks to six bucks.
>
> * * *
>
> Are those two staffers still working for the FCC? . . . I think I would like to ask them to come and let us talk about what happened in that meeting. ***Something happened in that meeting.***

3. Senator Kennedy correctly determined that ***something*** meaningful happened at that meeting. Now, through investigation of counsel—including interviews with (1) a ***senior Intelsat employee***, who worked directly with CEO Stephen Spengler and other senior Intelsat executives on the C-Band auction issue, and who had access to the highest levels of information and executives, and (2) a ***senior executive of the C-Band Alliance***, who had knowledge about the Intelsat Board involvement in the C-Band issue—we now know what happened:

(a) Prior to the November 5, 2019 meeting with senior FCC staff, Intelsat felt ***it had a handshake deal*** on its lucrative proposal to auction off spectrum licenses;

(b) During that November 5, 2019 meeting between the FCC and Intelsat's CEO, the FCC made a ***180-degree reversal***, sharply turning against Intelsat's bet-the-company plan; and

(c) Knowing that the FCC had reversed course against Intelsat's proposal, ***just hours after that meeting***, Defendants began selling $246 million in stock in an overnight fire sale, avoiding over $185 million in losses that investors suffered as Intelsat promptly collapsed.

## II. SUMMARY OF THE CASE

4. Intelsat operates one of the world's largest fleets of satellites. It traded on the New York Stock Exchange ("NYSE") with the ticker symbol "I." It earns revenue by providing communications services to its customers, such as TV broadcasters (*e.g.*, DirecTV), who transmit content using Intelsat's satellites. To avoid service issues – which can be caused when multiple broadcasts are transmitted over the same frequency – broadcasters are given licenses to broadcast at certain frequencies. As such, the right to use a certain band of frequency is valuable and each frequency range has different properties affecting its usefulness for various applications. In the United States, the FCC allocates licenses permitting broadcasters to utilize certain frequencies.

5. A significant portion of Intelsat's business involved broadcasting at a frequency range (*i.e.*, "spectrum band") known as the "C-Band." This band is often used for TV broadcasts. Intelsat had invested $36 billion in buying and developing the technology and infrastructure for its C-Band business over a period of 40 years and it had various licenses from the FCC permitting it to broadcast in that frequency range.

### A. The Bet-the-Company Deal

6. By 2017, there was a broad public discussion about the possibility of freeing up the C-Band, so that it could be repurposed for cell phone broadcast services as part of the adoption of the newest generation of cell phone service, referred to as "5G," which would be

faster and better connected than earlier cell phone services. By September 2017, Intelsat began advocating for what it has described as "an innovative structure" to clear C-Band spectrum. Intelsat formed an alliance with several other satellite broadcasters known as the "C-Band Alliance" or "CBA" to advance a spectrum clearing plan that would suit their interests.

7. The CBA's proposal was for its members to voluntarily vacate the C-Band and then sell the right to use that spectrum to cell phone service providers. The CBA proposal would have compensated CBA members for their voluntary participation in freeing up the C-Band, by providing them with profits when they resold the use rights to cell phone service providers. It was estimated that the auction would generate upwards of $60 billion. The deal would have been extremely lucrative to the dangerously indebted Intelsat, with one analyst estimating that if the CBA's proposal went forward, Intelsat's market capitalization would increase by 770%.

8. The CBA's proposal, in its various forms, has often been referred to as a "private auction." In the alternative "public auction" proposals, the FCC would take Intelsat's licenses, conduct the auction itself, and remit most or all of the proceeds to the U.S. Treasury.

9. By the Fall of 2019, the CBA's proposal was on its way to being approved by the FCC. In the words of one VP-level former employee of Intelsat ("CW-1"), "the FCC had been giving Intelsat 'all the right body language' to indicate it was likely to support Intelsat's plan." This witness, who worked as part of a small working group, along with CEO Stephen Spengler and other senior Intelsat executives, focused on the C-Band auction issue, and explained that Intelsat's CEO felt for a long time that he had a handshake deal with the FCC Chairman Pai on a private auction deal.

10. On September 30, 2019, analysts at Evercore wrote "we continue to believe that a private auction of C-band spectrum is likely in [the first half of 2020], following a successful completion of the FCC rulemaking."[1] On October 1, 2019, Morgan Stanley wrote that "***The***

---

[1] If adopted, the CBA's proposal would have been approved through a process of formal FCC rulemaking, in which Chairman Pai's vote would likely prove decisive.

***FCC appears ready to permit the C-Band Alliance to run an auction.***" On October 18, 2019, J.P. Morgan stated that the market was "underpricing the likelihood" of the CBA selling the spectrum and "reaping substantial proceeds" because the ***CBA has "support of key decision makers at the FCC.***"

11. However, CW-1 explained that "towards the end of October" 2019, things "started to get weird," with rumors that Senator John Kennedy was meeting with FCC Chairman Ajit Pai and President Donald Trump about the C-Band issue. CW-1 said there was intense interest inside Intelsat into whether Senator Kennedy would influence FCC Chairman Pai or President Trump to reject the C-Band proposal.

12. Despite these internal concerns, the market remained optimistic about the prospects of the plan being approved. As late as November 4, 2019, the day before the start of the Class Period, Jefferies opened its analyst note stating "Well here we are, the beginning of the home straight for the C-band trade." The firm reiterated their suggestion to buy Intelsat stock, based on the prospects of the CBA proposal being accepted.

**B. The November 5, 2019, FCC Meeting**

13. CW-1 explained that prior to the November 5, 2019 meeting, Intelsat believed it had a handshake agreement with the FCC in favor of their proposal. Indeed, in bankruptcy court trial testimony, Intelsat's CEO Stephen Spengler also confirmed that before the November 5, 2019 meeting, he had "an understanding that [FCC Chairman] Pai may have made a soft commitment to back a private auction." Similarly, according to Stephen Collar, the CEO of SES (the other major member of the C-Band Alliance), prior to the meeting, the C-Band Alliance "***felt that we had White House*** support for our proposal for a private auction."

14. However, in response to the rumors that Senator Kennedy was trying to influence the FCC away from that proposal, there was intense interest within the Company about whether those rumors were true.

15. On the evening of November 4, 2019, the Chief Executive Officer (CEO) of Intelsat, Stephen Spengler, and the CEO of fellow CBA member SES S.A. ("SES"), abruptly

requested to meet with FCC staff the following morning. The FCC agreed, and the meeting was held at 9:00 am the following morning. The meeting was attended by Intelsat's CEO and Senior Counsel to FCC Chairman Pai, Nicholas Degani, SES's CEO Mr. Collar, among a few others.

16. The message delivered by the FCC to Intelsat on November 5th was clear. CW-1 was told that during the meeting, the FCC officials indicated that they would push ***for a public auction***, rather than going with Intelsat's private auction proposal. This meant Intelsat would lose billions of dollars it expected to receive through its private auction proposal. CW-1 further explained that he was informed just after the meeting by CEO Spengler that the meeting had confirmed the rumors that the FCC was leaning toward going with Senator Kennedy's approach. CW-1 recalled that those within Intelsat had described the FCC as making "***a complete 180***" in that meeting, as the process took a "***turn for the worse***." CW-1 added that after meeting with Spengler, CW-1 surmised it ***must have been one of the top three worst meetings*** Spengler ever had.

17. Confidential Witness 2 ("CW-2"), a senior executive at the C-Band Alliance, firmly corroborated these allegations. CW-2 recalled that after the meeting in the District of Columbia, Spengler went to the CBA's offices to debrief CW-2 and others. CW-2 also recalled speaking with Peter Pitsch (the Head of Advocacy & Government Relations for the CBA), who had attended the meeting, about what had happened in the meeting. CW-2 said that the meeting with the FCC had gone poorly and that the messaging from the FCC was negative. CW-2 said that as a result of the meeting they felt things were off track. He also said that after the meeting their plan was to try to get things "back on track" and that they understood the FCC would reject their proposal otherwise.

18. In bankruptcy court, Intelsat's CEO testified that — whereas prior to the November 5, 2019 meeting, he felt he had a "soft commitment" from the FCC to back the private auction — he was "***worried coming out of this meeting that the FCC was going to reject the market-based approach.***"

19. SES's CEO, who participated in the meeting, testified that it was an "unusual meeting" and that Degani (of the FCC) had typically explained the position of the FCC chairman, and further explained how the C-Band Alliance should look at things, and give direction, but that on November 5, 2019, Degani "was very – very quiet. He responded only to a handful of questions. And he ***gave us reason to believe that the plan we had,*** which was for a – a private auction, would – ***was at risk***."

20. SES's CEO also testified that after the meeting, the C-Band Alliance participants, including Spengler, went back to a hotel "to talk about what [they] had heard," adding, "***the cause for concern was***, we were introducing how we thought the process was going, and we indicated that ***we felt that we had White House*** support for our proposal for a private auction, a private sale process. And ***Nick Degani said something*** which was hard to interpret. But certainly, one interpretation of what he said was that that wasn't the case and that ***we were running into political objection***." Then, when asked what Spengler said to him when they spoke after the meeting, SES's CEO recalled that "***[w]e were trying to figure out how much trouble we were in***," and that he and Intelsat's CEO (Spengler) "concluded" that Degani had sent them a message that they didn't have political support for the private auction. SES's CEO reiterated that the issue was "high stakes" and that they were "sensitive to everything that we were being told," concluding that "***this was direct information from the chairman's office***."

21. Intelsat's understanding of the FCC's changed position and of the increased risk that the private auction would not be approved is further demonstrated by Intelsat's internal reaction to the development.

22. CW-1 explained that just after the early November FCC meeting, Intelsat began working on a revised proposal to salvage its private auction plan. More specifically, CW-1 said that the revised plan showed that Intelsat would voluntarily make monetary contributions to the U.S. Treasury based on the proceeds of the auction, which should have made the proposal more attractive to the FCC. CW-1 also explained that this plan was a reaction to the negative developments at the meeting and an attempt to salvage the deal with the FCC.

23. CW-2 was also familiar with the revised proposal. According to CW-2, the CBA had always discussed the concept of adding a "voluntary contribution" to the U.S. Treasury as a possible lever in negotiating the proposed deal. He explained that after the meeting with the FCC, the CBA and its members put together a revised proposal with additional details about the CBA members' willingness to make cash contributions. He said this proposal was part of their attempt to regain FCC support for the private auction proposal.

24. Indeed, on November 8, 2019, just three days after the November 5, 2019 meeting, and again on November 15, 2019, Intelsat submitted revised proposals with the FCC offering to clear more spectrum and offering to make a significant contribution to the U.S. Treasury. These significant concessions reflected Intelsat's belief that — due to the FCC's changed position — substantial changes would need to be made if there was any hope of salvaging the deal.

25. On November 14, 2019, Intelsat held a Board meeting where CEO Spengler formally recognized the FCC's change in position. Notably, there had been no formal meetings with the FCC between the November 5, 2019 meeting and this Board meeting — strongly indicating that the information presented in that meeting reflected Spengler's views of the November 5, 2019 meeting. The minutes of the Board meeting stated that:

> "Mr. Spengler noted that while the project had been on track for a favorable FCC order expected in late November, ***recent developments indicated a fundamental change in the commission's view*** and approach to addressing the C-Band Spectrum. ***It was expected that the FCC would announce a shift in posture*** towards a public auction where proceeds would go to the U.S. Treasury.

26. Indeed, the day after that Board meeting, November 14, 2019, Intelsat executives worked to prepare a media statement to respond to the expected announcement that the FCC was rejecting the private auction plan. A draft of that statement began: "The FCC announcement proposing a public auction is a significant departure from the CBA market-based proposal."

### C. The Insider Sales Immediately Following the November 5, 2019 Meeting

27. During the afternoon and evening of November 5, 2019 – *i.e.*, immediately following Intelsat's meeting with the FCC – the Chairman of Intelsat's board and its two largest shareholders executed a massive $246 million sale of stock at a steep 6.6% discount to the market price. As the *New York Post* would later write, in a March 4, 2020 article entitled "***Intelsat's biggest investors sold shares just before massive stock plunge***," Morgan Stanley brokered the deal with "***no advance warning*** that the sale was coming, and interested buyers were told they had an hour or so to decide."[2]

28. At the direction of BC Partners, Silver Lake, and McGlade, Morgan Stanley desperately issued solicitation emails across the market looking for buyers. One of Morgan Stanley's Executive Directors, blasted an email[3] out, just after markets closed, stating that a group led by BC Partners was selling a block of 10 million shares. The deal was shopped at a price of $24.50-$25.00. This was well below the November 5, 2019 market closing price of $26.33. The price had to be lower to draw buyers' attention and allow for a quick sale – indicative of a desperate seller, seeking to offload shares before the public learned of the disastrous meeting that transpired earlier that day.

29. BC Partners, Silver Lake, and McGlade ultimately offloaded 10 million shares for about $246 million. McGlade was the Chairman of Intelsat's board and, based on his position (and as corroborated below by CWs), undoubtedly would have been kept informed of the vitally important meetings with the FCC and Intelsat's plans for a revised proposal. BC Partners was by far the largest shareholder of Intelsat, owning about 41% of the Company as of Intelsat's 2018 Annual Report. BC Partners was represented on the board, subject to a formal governance agreement, by two directors – Defendants Svider and Bateman. Silver Lake was Intelsat's

---

[2] All emphasis in this Complaint is added, unless otherwise indicated.

[3] These allegations are based on emails from Morgan Stanley and the potential purchasers who were solicited by Morgan Stanley, that have been reviewed by Lead Counsel.

second largest shareholder, owning about 9% of the Company prior to the sales. Additionally, Silver Lake was entitled to special information rights providing it with board-level information, pursuant to a shareholder agreement.

30. CW-1 found out about the stock sales after he noticed the high volume of trades on a New York Stock Exchange internal system at Intelsat. CW-1 advised that after learning about the trades, he called CFO David Tolley about the trades, and Tolley responded that he knew nothing about it. CW-1 added that a short while later, Tolley then called him back to discuss the trades. CW-1 explained that it was "obvious" that these insiders had been updated about the meeting. He further added that in the past, including when Intelsat itself had been making stock offerings, the Company had instituted formal "information blackouts," which had intentionally restricted the flow of information to board members to avoid raising eyebrows about potentially improper trading. He said ***that no such blackout was in place at the time of the trades*** in early November, meaning that information was flowing freely to the board. CW-1 further confirmed that these trades ***were not given preapproval by Intelsat.*** CW-1 recalled that he felt the trading was ***"outrageous"*** and that the situation at the Company around that time had gotten extremely negative.

31. CW-2 explained that BC Partners was generally kept up to speed on the negotiations with the FCC and the C-Band issue, by Intelsat. CW-2 advised that there were usually two weekly calls about the C-Band issue: one with Senior Satellite company executives, and the other was the CEO meeting, where he met with the CEOs of Intelsat and SES. CW-2 further advised that Intelsat senior management was "very up to speed" on the FCC negotiations, and that it was senior management who would update Intelsat's Board. CW-2 was aware that CEO Stephen Spengler generally kept Intelsat's Board updated on the FCC negotiations because Spengler sometimes asked CW-2 for information and slides to put in presentations to the Board. CW-2 added that he participated in one Intelsat Board meeting in April 2019 and that during that meeting the Board was updated on the plans for C-Band spectrum, and negotiations with the FCC. CW-2 said that he thinks the updates would have become even more frequent as the

negotiations progressed. Accordingly, it makes sense that Intelsat's board members were quickly made aware of the disastrous November 5th FCC meeting.

32. CW-3 held a VP level position at Intelsat and provided further information about the rapid flow of information among Intelsat's leadership. CW-3 explained that CEO Steve Spengler, General Counsel Michelle Bryan, and Chief Commercial Officer Mike DeMarco worked together constantly and that some of them knew each other for "decades." CW-3 further explained that these members of Intelsat's leadership sat together on the 20th floor. CW-3 commented that the potential upside of the deal was so great that if it succeeded, the leadership would make so much that people would retire, adding that they were all paying very close attention to the issue.

33. CW-3 described BC Partners representatives Justin Bateman and Raymond Svider as "very involved" with Intelsat and explained that they sometimes came to the 20th Floor to work with Intelsat's leadership. CW-3 recalled that Tolley often had calls with Bateman, and also recalled that Tolley knew Svider from before working together on Intelsat.

34. CW-3 also added that McGlade had previously run Intelsat and regularly came into the office to work on the 20th floor, in addition to attending Board meetings. CW-3 explained that McGlade stayed heavily involved in the Company and with the people at the more senior levels. CW-3 further explained that, to update McGlade and BC Partners about developments in the C-Band negotiations, Spengler would just jump on a conference call, and that they would not usually wait to prepare more formal communications, like memos. CW-3 added that people would often just be updated in-person, as they worked so near each other on the 20th floor, and that Spengler would immediately debrief McGlade and others on the 20th floor with updates about the developments on the C-Band negotiations.

35. Indeed, bankruptcy filings have further confirmed the substantial real-time communications that occurred between Intelsat's senior insiders. Intelsat's General Counsel Michelle Bryan, CEO Stephen Spengler, CFO David Tolley, Chief Technology Officer Bruno Fremont, and Defendant McGlade texted with each other concerning the C-Band issue.

Defendants McGlade, Svider, and Bateman received updates from Intelsat's management aside from those presented in formal board meetings. For example, on November 18, 2019, Intelsat's General Counsel sent an email with the subject "C-band Update" to Defendants McGlade, Svider, and Bateman, among others.

**D. The Collapse**

36. In the two weeks after Intelsat's insiders ditched shares worth $246 million, its share price collapsed, as news of the failed CBA proposal began to emerge.

37. On November 8, 2019, the CBA published a document revealing its revised proposal to the FCC. This proposal would require CBA members to remit a large portion of any auction proceeds to the U.S. Government. This was an attempt to win back support for their struggling proposal. The CBA also disclosed, in a terse two paragraph letter, that Intelsat's CEO had met with members of the FCC regarding the C-Band proposal. On November 8, 2019, the market price for Intelsat closed 9% below the price it had closed at on the day the insiders sold their stock. No mention was made of the FCC's negative reaction or rejection of the CBA proposal.

38. Following November 8, 2019, information continued to leak into the market regarding the decreased prospects of an FCC deal. Then, on November 18, 2019, FCC Chairman Pai announced that he supported a public auction. This disclosure left no doubt that the CBA's proposal had failed. On November 18, 2019, Intelsat's stock ***declined by about 40%***, meaning that it ***closed 70% lower*** than it had the day the insiders dumped their stock. The next day, the stock continued collapsing on this news ***falling by more than 24%*** and ending the day ***77% below*** the closing price on November 5, 2019—when the insiders traded..

39. On February 28, 2020, it was announced that the FCC had formally voted 3-2 to reject the CBA proposal and adopt a public auction. With the bet-the-company deal off the table, Intelsat imploded, ultimately filing for bankruptcy just months later on May 14, 2020. As news articles after the bankruptcy filing explained, Intelsat was forced into bankruptcy because it lacked the funds necessary to cover the costs associated with migrating its C-Band business and

participating in the FCC's public auction approach, further evidencing that the CBA proposal truly was critical to the Company's survival.

40. By unloading their $246 million in stock before the collapse, Defendants – with the benefit of their insider knowledge – were able to collectively avoid over $185 million in losses – measured just based on the losses spanning until November 19, 2019. Conversely, innocent investors were left holding the bag.

41. The following table shows Intelsat's stock price around the time of the Class Period:



## III. JURISDICTION AND VENUE

42. This complaint alleges claims which arise under (1) Section 10(b) of the Securities Exchange Act (the "Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5; and (2) Section 20A of the Exchange Act, 15 U.S.C. § 78t-1.

43. This Court has subject matter jurisdiction over this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331. During the Class Period, Intelsat's stock was listed on the NYSE, and maintained its headquarters in Luxembourg and offices in the United States. During the Class Period, the Individual Defendants were members of Intelsat's board of directors.

44. Venue is proper in this judicial district pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b). Defendant Silver Lake is based in this District.

45. In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, interstate email communications, and the facilities of the NYSE.

## IV. PARTIES AND RELEVANT PERSONS

### A. Lead Plaintiff

46. The Walleye Group is the court appointed Lead Plaintiff in this action. Two individual parties comprise the Walleye Group: (1) Walleye Opportunities Master Fund Ltd, and (2) Walleye Manager Opportunities LLC. Both entities are sophisticated investors, affiliates of each other, and managed by a hedge fund adviser called Walleye Capital LLC. As set forth in its PSLRA certification (*see* ECF No. 36-2), the members of the Walleye Group purchased Intelsat stock during the Class Period and contemporaneously with Defendants' sale of that stock.

### B. Defendants

47. **BC Partners** (comprised of BC Partners LLP; Serafina S.A.; BC European Capital VIII; BC European Capital-Intelsat Co-Investment; BC European Capital-Intelsat Co-

Investment 1; CIE Management II Limited; LMBO Europe SAS) operates a private equity business. The parent entity, BC Partners LLP, is incorporated in England and Wales, its registered office is located at 40 Portman Square, London, and it has offices in the United States. BC Partners had been a significant shareholder of Intelsat since 2008. Prior to selling shares on November 5, 2019, BC Partners was Intelsat's largest shareholder, and as of Intelsat's 2018 Annual Report it held over 56 million shares representing about 41.1% of the Company's outstanding equity.

48. In public filings, such as the SEC Form 13G that BC Partners filed for the year 2018, BC Partners recognized that the entities through which BC Partners held shares in Intelsat may be deemed to have shared voting and investment power with respect to such shares, are members of a group with each other, and are affiliates of each other. BC Partners entity, Defendant Serafina S.A., is listed on Intelsat's 2018 Annual Report as beneficially owning 56,774,455 shares.

49. BC Partners has two representatives on the Intelsat Board, Defendants Raymond Svider and Justin Bateman.

50. Defendant **Raymond Svider** is a partner and chairman at BC Partners and was Chairman of the executive committee at BC Partners. He has worked at BC Partners since 1992. He was nominated to the Intelsat board by BC Partners through a governance agreement between BC Partners, Silver Lake and the Company. He served on the Board throughout the Class Period. Mr. Svider first became a director of Intelsat in February 2008 and served as Chairman of the Intelsat Board from 2008 until 2013, when he was replaced by Defendant McGlade.

51. Defendant **Justin Bateman** was a partner out of B.C. Partners' New York office, which he co-founded in 2008. He had worked with B.C. Partners since 2000. He served on Intelsat's board since 2008 and was nominated to the Intelsat board by BC Partners through a governance agreement between BC Partners, Silver Lake and the Company. Justin Bateman is no longer with BC Partners.

52. **Silver Lake** (comprised of Silver Lake Group, L.L.C.; SLP III Investment Holdings S.à r.l.; Silver Lake Partners III, L.P.; Silver Lake Technology Investors III, L.P.; Silver Lake Technology Associates III, L.P.; SLTA III (GP), L.L.C.) operates a private equity business. The parent entity, Silver Lake Group, L.L.C., is incorporated in Delaware, with its principal place of business in Menlo Park, California. Silver Lake Group, L.L.C. is an investment management firm registered with the SEC, with approximately $2.8 billion in assets under management. According to public filings, Silver Lake, which owned over 9.8 million Intelsat shares as of September 30, 2019, sold over 2.8 million shares in the period ended December 31, 2019, downgrading it to Intelsat's fourth-biggest shareholder from the second biggest.

53. In public filings, such as the SEC Form 13G that Silver Lake filed for the year 2018, Silver Lake recognized that the entities through which Silver Lake held shares in Intelsat may be deemed to share dispositive power over such shares, are members of a group with each other, and are affiliates of each other. The parent entity, Silver Lake Group, L.L.C, is listed on Intelsat's 2018 Annual Report as beneficially owning 12,380,437 shares, which number includes shares held by Silver Lake entity SLP III Investment Holdings S.à r.l., which is listed as beneficially owning 12,102,657 shares.

54. Silver Lake did not directly have representation on Intelsat's board. However, it was entitled to information rights under a shareholder agreement with the Company. Furthermore, it was entitled to generally receive confidential information from the Company.

55. Defendant **David McGlade** was the Chairman of Intelsat's Board during the Class Period. According to Intelsat's website, "in his role he is responsible for helping Intelsat cultivate and build strategic partnerships and broader business relationships, ***government outreach***, as well as advising Intelsat's Chief Executive Officer and senior leadership team on business and policy issues." Prior to serving in his current role, he was Intelsat's CEO from 2005 to 2015. In that role, he led the sale of Intelsat to Silver Lake and BC Partners. Defendant McGlade held 4,537,793 shares of Intelsat common stock as of the Company's 2018 Annual

Report. He held his Intelsat common stock through McGlade Investments II, LLC; the Article 4 Family Trust U/T David McGlade 2009 GRAT; the David P. McGlade Declaration of Trust; David McGlade 2019 Intelsat GRAT 2; and the David McGlade Revocable Trust.

**C. Other Relevant Persons, Entities and Witnesses**

56. **Intelsat** was organized as a public limited liability company (société anonyme) under the laws of the Grand-Duchy of Luxembourg on July 8, 2011. The Company's principal executive office is in Luxembourg. During the Class Period, Intelsat's common shares were listed on the NYSE under the symbol "I." Intelsat completed its initial public offering ("IPO") on April 23, 2013. On May 13, 2020, it declared bankruptcy and has subsequently been delisted from the NYSE and now trades with the ticker symbol "INTEQ."

57. The **C-Band Alliance** or CBA was an industry group comprised of four large communications satellite operators in 2018–20. It was established in September 2018 by Intelsat, SES, Eutelsat and Telesat. Those four firms provide the majority of C-Band satellite services in the U.S., including media distribution reaching 100 million US households. Intelsat was the largest of these four companies, and the following table shows the relative size of the four companies based on revenue:

| **Fiscal Year 2019 Revenue**[4] | | | |
|---|---|---|---|
| Intelsat | Eutelsat | SES | Telesat |
| $2.061 billion | $1.481 billion | $1.766 billion | $1.184 billion |

58. The **FCC** is the United States government agency responsible for overseeing the country's communications systems. As stated on its website, among many other responsibilities, the FCC is responsible for "managing and licensing the electromagnetic spectrum for commercial users and for non-commercial users." The FCC has historically carried out a variety of public auctions permitting interested parties to buy licenses of various bands of spectrum. The

[4] These figures assume a conversion rate of $1.1213 USD for each euro and $0.769 USD for each Canadian dollar, based on the conversion rates on December 31, 2019.

FCC has consistently maintained that the spectrum itself, *i.e.*, the right to broadcast at a certain frequency, is a public asset. For example, on October 17, 2019 FCC Chairman Pai testified that the C-Band is a "public resource that is owned by the American people" and that the FCC was "imbued by Congress with authority as the steward of [the airwaves]."

59. **Confidential Witness 1** ("CW-1") was formerly employed by Intelsat as a Vice President for at least several years prior to the Class Period and throughout the entire Class Period. He[5] worked as part of a small working group, along with CEO Stephen Spengler and other senior Intelsat executives, focused on the C-Band auction issue and the negotiations with the FCC. He confirmed that he was kept up to date on issues related to the C-Band auction through emails, phone calls, and meetings with members of the working group. He participated in twice a week meetings with the C-Band Alliance, and he visited the C-Band Alliance's office twice a week.

60. **Confidential Witness 2** ("CW-2") was a senior executive at the C-Band Alliance throughout the entirety of 2019. CW-2 worked closely with the senior management of Intelsat and SES in developing the CBA's proposals and in developing and executing the strategy pursued by the CBA for reaching agreement with the FCC on a plan to clear the C-Band in a way that was fair to and in the interests of the CBA members.

61. **Confidential Witness 3** ("CW-3") was formerly employed by Intelsat at a VP level position from before the start of 2019 until at least the beginning of 2021.

## V. SUBSTANTIVE ALLEGATIONS

### A. History of Intelsat's Business and C-Band

62. Intelsat is a satellite operator that provides TV and radio communications. The Company's website states: "Our global network consists of the world's largest satellite fleet working in concert with terrestrial networking infrastructure and robust managed services." The Company's satellite fleet covers more than 99% of the world's populated regions.

[5] Confidential witnesses are described using male pronouns regardless of their gender.

63. Under the 1912 Radio Act, transmission of radio broadcasts required a license from the Department of Commerce, which policed broadcast stations to minimize interference.[6] Interference occurs when more than one party is trying to broadcast within a given range of frequencies in the same space. In 1926, a court challenge ended this regulatory scheme and interference problems proliferated.

64. Congress adopted the Radio Act of 1927, and later the Communications Act of 1934 (which has been amended periodically and remains the charter for broadcast television today). This law established a short-term licensing regime that assigned broadcasters to designated frequency ranges in the electromagnetic spectrum. Congress also required broadcasters to operate out of the public interest, convenience, and necessity.

65. In the early 1960's, with the passage of the Communications Satellite Act of 1962, satellite broadcasters were offered spectrum licenses so they could develop a global satellite communications system. According to its website, Intelsat was founded in conjunction with the passage of that law, and launched the world's first commercial communications satellite in 1965. As *Barrons* wrote on November 20, 2019, the satellite operators "didn't pay for the spectrum," but they had "invested billions in satellites, ground stations, and other technology to create a crucial resource."

66. In the United States, nearly all television programming and most syndicated radio are carried on a range of spectrum known as the C-Band, by satellite transmissions. According to Intelsat, the Company "hold[s] the largest collection of rights to well-placed orbital slots in the most valuable [C-Band] spectrums."

**B. History of Intelsat's Involvement with Silver Lake and BC Partners**

67. After 37 years of existing as a complex inter-governmental organization (controlled by various countries through international agreement), Intelsat became a private

---

[6] Stuart N. Brotman, *Revisiting the Broadcast Public Interest Standard in Communications Law and Regulation*, Brookings Institute (Mar. 23, 2017).

company in 2001. Following this reorganization, Intelsat was primarily owned by its pre-reorganization stakeholders. Then, in 2004, Intelsat was acquired by a consortium of funds affiliated with Apax Partners, Apollo Management, Madison Dearborn Partners, and Permira. The deal was heavily funded by new debt levied on Intelsat.

68. In 2005, Intelsat acquired PanAmSat, one of the other largest operators in the satellite industry. Additionally, that deal further indebted Intelsat, as it refinanced or assumed PanAmSat's substantial outstanding debt obligations.

69. In 2007, Intelsat agreed to a deal whereby its owners would sell a 76% stake in the business to BC Partners and Silver Lake. The remaining 24% of the Company would be owned by its prior investors. The deal resulted in Intelsat taking out an additional $3.85 billion in debt. Shortly after acquiring control of the Company, BC Partners was represented on the Board with two directors, and Silver Lake was also represented by two directors.

70. In 2013, Intelsat launched its initial public offering. Industry publications such as *Via Satellite* generally regarded the IPO as a flop, and attributed the under-performance to the Company's high level of debt. Through the IPO, the Company's legacy owners, the funds that owned it prior to the BC Partners-Silver Lake deal, sold their position. However, BC Partners and Silver Lake did not sell in the IPO.

71. Following the IPO, Silver Lake and BC Partners were entitled to special Board-level information rights from the Company, in recognition of their privileged role and expanded duties as controlling shareholders. Silver Lake was entitled to, subject to certain limitations, "receive from the Company upon reasonable request any information." It was also stated that Silver Lake "may from time to time" receive "non-public information about the Company."

72. BC Partners had similar information rights, which would go into effect once it was no longer entitled to nominate Board members, due to a substantial decline in its investment in the Company. Furthermore, the agreement expressly stated: "The BC Investor agrees and acknowledges that the Company and the BC Directors may share confidential, non-public information about the Company and any of its subsidiaries with the BC Investor."

73. Additionally, BC Partners retained a formal right to nominate at least two Board members after the IPO. In October 2016, Silver Lake's two representatives of the Board resigned, but it continued to be entitled to special information rights. BC Partners continued to be represented on the Board by Defendants Svider and Bateman.

74. These agreements and rights remained in place after Intelsat conducted a secondary offering on June 6, 2018 ("June SPO"). According to the registration statement and prospectus filed with the SEC in connection with the June SPO, BC Partners and Silver Lake were expected to hold in the aggregate approximately 58-59% of Intelsat's common shares and the filings related to that offering recognized that "by virtue of their share ownership, [they] may be able to influence decisions to enter into any corporate transaction or other matter that requires the approval of shareholders."

75. Similarly, the registration statement and prospectus issued in connection with the Company's November 30, 2018 secondary offering ("November SPO") noted BC Partners' and Silver Lake's significant Intelsat ownership, stating: "Immediately following the consummation of this offering, BC Partners, Silver Lake, and their affiliates (the 'Sponsors') are expected to hold in the aggregate approximately 49.3% of our common shares, assuming no exercise of the underwriters' option to purchase additional shares. By virtue of their share ownership, the Sponsors may be able to influence decisions to enter into any corporate transaction or other matter that requires the approval of shareholders."

76. Then, in December 2018, Intelsat entered into a new governance agreement with BC Partners and a new shareholders agreement with BC Partners, Silver Lake, and other affiliates – both of which remained in effect throughout the Class Period. Those agreements retained the entities' special information rights, "including the receipt of the board meeting materials."

77. In each case, these agreements made clear that while information would be shared with the BC Partners and Silver Lake investors, the Company still expected the information to be treated as confidential and not disclosed publicly. At all relevant times, Intelsat had a code of

conduct in place that restricted trading on material non-public information and detailed rules about not disclosing confidential information obtained by the Company, outside of official channels. For example, Intelsat's Code of Business Conduct and Ethics stated that it would be "improper," without "proper authorization," to "give or make available to anyone or use for your benefit any confidential Intelsat information."

**C. The Bet-the-Company Plan for a Private C-Band Auction**

78. By 2017, there was a broad public discussion about the possibility of freeing up the C-Band, so that it could be repurposed for cell phone broadcast services as part of the adoption of the newest generation of cell phone service, referred to as "5G." By September 2017, Intelsat began advocating for what it has described as "an innovative structure" to clear C-Band spectrum. Intelsat formed the CBA to advance a spectrum clearing plan that would suit their interests—and possibly greatly enrich Intelsat.

79. The CBA's proposal was for its members to voluntarily vacate the C-Band and then sell the right to use that spectrum for cell phone service providers. Any plausible migration from the C-Band would require expensive moving costs for the CBA members, as they found technical solutions to continue serving their customers without use of the C-Band. This migration would be extremely disruptive to the C-Band members and would require significant spending on their end to offer their customers the same service without broadcasting over the C-Band. This migration would also likely speed up the long-term trend away from satellite broadcasts, in favor of fiber optic internet solutions.

80. Under the CBA's proposal, its members would be compensated for their voluntary participation in freeing up C-Band spectrum, by enabling them to retain the profits derived from auctioning off the right to use that spectrum to cell phone service providers. It was estimated that a private auction would generate upwards of $60 billion. This was many times more than the costs CBA members would incur in migrating away from the C-Band. Kerrisdale Capital estimated in June 2018, that if the CBA's proposal went forward, Intelsat's valuation would ***increase by 770%***. The CBA pitched their proposal by explaining that it would be faster

than alternatives (by avoiding litigation that would otherwise be brought by the CBA) and by arguing that it would be equitable to permit the CBA members to receive the appreciated value of the spectrum they held licenses to utilize.

81. The CBA's proposal, in its various forms, has often been referred to as a "private auction." In contrast, others had pushed for a "public auction," wherein the U.S. Government would get to keep the auction proceeds. In a public auction, CBA members would be required by the FCC to vacate the C-Band, and the CBA members would only be paid a modest amount to compensate them for the costs of migrating their business and to incentivize a quick move. In a public auction, the U.S. government would receive the proceeds of auctioning off the C-Band to wireless operators. It was the FCC's position (but disputed by the CBA) that the FCC had the authority to reallocate the licenses to use the C-Band, and that the spectrum was not in fact owned by the CBA members, but instead was an asset owned by the U.S. Government.

82. By the Fall of 2019, it was likely that the CBA's private auction proposal would be accepted by the FCC. In the words of CW-1, "the FCC had been giving Intelsat ***all the right body language*** to indicate it was likely to support Intelsat's plan."

83. Similarly, CW-3 explained that there had been an ongoing assumption internally at Intelsat that everything was fine with the FCC negotiations. He added that it was known internally all along that a public auction would lead to a bankruptcy for Intelsat.

84. On September 30, 2019, analysts at Evercore wrote: "we continue to believe that a private auction of C-band spectrum is likely in 1H20, following a successful completion of the FCC rulemaking." On October 1, 2019, Morgan Stanley wrote that "The FCC appears ready to permit the C-Band Alliance to run an auction." On October 18, 2019, J.P.Morgan stated that the market was "underpricing the likelihood of Intelsat and the CBA's eventually selling spectrum and reaping substantial proceeds" because the CBA has "support of key decision makers at the FCC."

**D. The Lead-up to the Meeting with the FCC**

85. As late as November 4, 2019, the day before the start of the Class Period, Jefferies opened their analyst note stating "Well here we are, the beginning of the home straight for the C-band trade." The report went on to note their "bullishness" on the deal based on their "extensive reading of the public tea leaves." Jefferies reiterated their suggestion to buy Intelsat stock, based on the prospects of the CBA proposal being accepted, raising their price target to $30.00.

86. While the public was largely optimistic, CW-1 explained that "towards the end of October" 2019, things "started to get weird," with rumors that Senator Kennedy was meeting with FCC Chairman Ajit Pai and President Trump about the C-Band issue. CW-1 said there was intense interest inside Intelsat into whether Senator Kennedy would influence FCC Chairman Ajit Pai or President Trump to disfavor the CBA C-Band proposal.

87. It is now known, but was not public at the time, that Senator Kennedy raised the C-Band issue with President Trump, and then Trump called FCC Commissioner Pai on Oct. 30, 2019 "to find out what the issue was about."[7] These meetings were an — ultimately effective — attempt to get Chairman Pai to reject the CBA proposal. Chairman Pai's position on this issue was critical, as the other 4 commissioners were split along party lines.

**E. The FCC Meeting**

88. In a clear reaction to the intense interest within Intelsat as to the possibility of Senator Kennedy persuading Chairman Pai to reject the plan, Intelsat's CEO, along with an attorney for the CBA, and the CEO of the second largest member of the CBA, SES, urgently scheduled a meeting with the FCC. The meeting was requested by an attorney for the CBA on Monday evening, with an email to Nicholas Degani, Chairman Pai's Senior Counsel, requesting that the meeting occur "tomorrow early morning" and apologizing for the "late notice." Mr.

[7] This meeting was only made public on November 18, 2019, when *Reuters* published an article noting the meeting in its discussion of the failed C-Band proposal.

Degani promptly replied by agreeing to meet at 9:00 am, at the FCC's offices in Washington D.C.

89. Prior to the meeting, Mr. Degani emailed with Chairman Pai about the meeting. Specifically, Mr. Degani said: "so... given where we are, **I assume I'd play it cold, no?**" Chairman Pai responded and approved of this strategy.

90. The next morning, on November 5, 2019, the meeting was held, as planned the day before. The CEOs of Intelsat and SES, representatives of the CBA, and Mr. Degani, met to discuss the CBA's proposal.

91. CW-1 explained that, at the November 5, 2019 meeting, Intelsat's CEO Stephen Spengler met with FCC officials at the FCC headquarters in Washington, D.C. to discuss the C-Band Alliance's proposal for a private C-Band auction. CW-1 said that the meeting was "very ominous," and that prior to that meeting they had their "pedal to the metal" based on the deal that Spengler had with FCC Chairman Ajit Pai. CW-1 believed that Spengler felt for a long time that he had a handshake deal with the FCC Chairman Pai on a private deal.

92. CW-1 explained that he was told "that during the meeting, the FCC officials indicated that they (the FCC) were "***changing their direction***," rather than going with Intelsat's proposal. CW-1 stated that he was also told that during the meeting, the FCC officials indicated that they would push for a public auction, rather than going with Intelsat's proposal. CW-1 recalled that within Intelsat they had described the FCC as making "***a complete 180***" in that meeting, as the process took a "***turn for the worse***." CW-1 also explained that he was informed, just after the meeting, that the meeting had "confirmed the rumors that the FCC was leaning toward going with Senator Kennedy's approach," but that "the fight was not over," because it may still be possible to win them over. CW-1 surmised after meeting with Spengler, that the meeting with the FCC must have been one of the top three worst of CEO Spengler's career. CW-1 added that, the Company felt like they had been "bait-and-switched" by the FCC, given that they had previously been supportive of Intelsat's and the CBA's proposal.

93. CW-2 was familiar with the November meeting between Intelsat CEO Stephen Spengler and the FCC. CW-2 stated that he did not attend the meeting. However, CW-2 recalled that after the meeting in the District of Columbia, Spengler went to the CBA's offices to debrief CW-2 and others. CW-2 also recalled speaking with Peter Pitsch (the Head of Advocacy & Government Relations for the CBA), who had attended the meeting, about what had happened in the meeting. CW-2 said that the meeting had gone poorly and that the messaging from the FCC was negative. CW-2 said that as a result of the meeting they felt things were off track. CW-2 also said that after the meeting their plan was to try to get things "back on track" and that they understood the FCC would reject their proposal otherwise.

94. According to CW-2, the FCC meetings usually took place in the FCC Chairman's office, and were usually attended by representatives from the FCC Chairman's office. CW-2 described Nicholas Degani as the FCC's "head wireless guy." CW-2 recalled that Degani would indicate his opinions and leanings, but he felt that Degani did not communicate clearly on what they should do to resolve his concerns. CW-2 also stated that he assumed that Degani and the other FCC staff had to be careful about what they said or made public. CW-2 advised that a notice of *ex parte* communication was filed after each meeting, but those documents did not fully portray what occurred in the meetings. CW-2 commented "it is not like the *ex parte* filings were a transcript."

95. In subsequent bankruptcy trial testimony, both the CEO of Intelsat and the CEO of SES, who participated in the November meeting, provided testimony regarding what had occurred.[8]

96. On February 7, 2022, SES's CEO Steven Collar testified as part of the eventual dispute between SES and Intelsat regarding the distribution of the proceeds of the eventual public auction of the C-Band Spectrum. Collar testified that in 2019 the C-Band issue was the

---

[8] For the avoidance of doubt, Plaintiffs does not concede that either CEO's public statements regarding the November 5, 2019, meeting have been entirely forthcoming, and Plaintiff intends to further develop the record through discovery. However, these statements provide an adequate basis for Plaintiff to *allege* that the content of the meeting was as stated herein.

"[t]he number one priority for the business." When asked if he recalled the November 5, 2019 meeting, Collar stated "***it was an unusual meeting***" and recounted how he met with Nick Degani who was the general counsel to the FCC Chair. Collar then recounted the participants in the meeting and confirmed, "***it was a strange meeting***." He then recounted the meeting as follows:

> **[Collar]:** Yeah. So the process was getting to – I would describe it as a critical phase. It felt like – I mean, we had been working for more than eighteen months in – in [earnest] on this project.
>
> We'd been engaged over all that time with the FCC. We'd had a number of meetings with Nick Degani, who was kind of running the process, I would say. Certainly running the day to day engagements with us over that entire period.
>
> And normally what happened in meetings with Nick Degani is he would pretty much tell us how it was. So he would explain the position of the chairman. He would explain how we should think about things. He would tell us – you know, give us direction.
>
> In this meeting, he didn't. He was very – very quiet. He responded only to a handful of questions. ***And <u>he gave us reason to believe</u> that the plan we had, which was for a – a private auction, would – was at risk***.
>
> **[Attorney]:** And at that time, November 5th, 2019, had you been hearing through the grapevine political opposition to the private auction proposal?
>
> **[Collar]:** Yes.
>
> **[Attorney]:** Okay. And based on what you observed and heard at the meeting, did you form an impression at that meeting about how you believed the FCC process would unfold?
>
> **[Collar]:** Yes.
>
> **[Attorney]:** And what was that?
>
> **[Collar]:** So actually, we all formed slightly different impressions, and we went back to the Mandarin Oriental Hotel immediately afterwards to talk about what we had heard. This specific concern was –
>
> **[Attorney]:** When you say, we all went back, who went back?
>
> **[Collar]:** So that was myself, Steve Spengler, Peter Pitsch, Jen Hindin, all of the attendees at the meeting. And I think Gregg Elias, as well, was there, who also works for – for Wiley Rein.

**[Attorney]:** Okay.

**[Collar]:** And specifically what had been the – the cause for concern was, we were introducing how we thought the process was going, and we indicated that ***we felt that we had White House*** support for our proposal for a private auction, a private sale process. And ***Nick Degani said something*** which was hard to interpret. But certainly, one interpretation of what he said was that that wasn't the case and that ***we were running into political objection***.

**[Attorney]:** Did you speak to Mr. Spengler at the Mandarin Oriental about the meeting?

**[Collar]:** Yes.

**[Attorney]:** What did he say?

**[Collar]:** ***We were trying to figure out how much trouble we were in***, whether this was a message that Nick Degani was sending to us to tell us you don't have political support, which was ultimately what ***we kind of all concluded***, or something else. So there was a lot of discussion.

You can imagine this was high stakes. We were getting towards the end of the process. We were very sensitive to everything that we were being told. We were trying to triangulate all the information that was – that was coming out. And ***this was direct information from the chairman's office*** that we were trying to make sure that we accurately interpreted.

97. On February 10, 2022, Intelsat's CEO, Stephen Spengler, testified as part of the eventual dispute between SES and Intelsat regarding the distribution of the proceeds of the eventual public auction of the C-Band Spectrum. Mr. Spengler testified as follows:

**[Attorney]:** Before this November 5th meeting, did you have an understanding that Mr. Pai may have made a soft commitment to back a private auction?

**[Spengler]:** To back a private auction?

**[Attorney]:** Yes.

**[Spengler]:** Yes, we – yes, we believed that the chairman was warming up to our proposal and moving – moving in the direction of – of backing it.

**[Attorney]:** And you also heard before November 5th that the President of the United States might support that?

**[Spengler]:** We heard that Mr. Kudlow was going to support it on behalf of the White House.

*[omitted clarification regarding Kudlow's role as White House representative]*

**[Attorney]:** But at this meeting, the tide seemed to be turning correct?

**[Spengler]:** Well, you know, we discussed this –

**[Attorney]:** Yes or no, sir? Did it appear to be turning?

**[Spengler]:** We didn't know. I can't –

**[Attorney]:** Okay.

**[Spengler]:** – answer that yes or no.

**[Attorney]:** Fine. Thank you.

**[Spengler]:** Okay.

**[Attorney]:** But you certainly – the tone at this meeting was different than prior meetings, correct?

**[Spengler]:** Yes.

**[Attorney]:** Mr. Degani was tight-lipped at this meeting, correct?

**[Spengler]:** Yes.

**[Attorney]:** Didn't respond clearly to your questions, correct?

**[Spengler]:** Yes.

**[Attorney]:** And your perception of the meeting was that it was just a weird meeting, right?

**[Spengler]:** I did say it was a weird meeting, didn't think it was a weird meeting.

**[Attorney]:** And you were worried coming out of this meeting that the FCC was going to reject the market-based approach, correct?

**[Spengler]:** I testified

**[Attorney]:** Yes or no, sir?

**[Spengler]:** – before –

**[Attorney]:** Yes or no? That's a yes or no question.

**[Spengler]:** Okay. Sorry.

**[Attorney]:** Were you worried – were you worried, yes or no, coming out of this meeting that the FCC was going to reject a market-based approach? Yes or no?

**[Spengler]:** Yes, but

**[Attorney]:** Thank you.

**[Spengler]:** – it was not definitive in my mind.

98. Later in that same trial testimony, CEO Spengler discussed a November 14, 2022 Board meeting. As part of that discussion, a portion of the Board meeting minutes were read into the record:

> "Mr. Spengler noted that while the project had been on track for a favorable FCC order expected in late November, ***recent developments indicated a fundamental change in the commission's view*** and approach to addressing the C-Band Spectrum. ***It was expected that the FCC would announce a shift in posture*** towards a public auction where proceeds would go to the U.S. Treasury."

99. Additionally, on February 10, 2022, Intelsat's Vice President of Investor Relations, Dianne VanBeber, testified as part of the eventual dispute between SES and Intelsat regarding the distribution of the proceeds of the eventual public auction of the C-Band Spectrum. Ms. VanBeber described herself as the "lead communicator on the C-Band project, lead communicator to the outside world." She testified as follows:

**[Attorney]:** Ms. VanBeber, let's move forward from the fall of 2018 to November of 2019 and the FCC chairman's tweet announcement regarding an FCC-run auction to clear the C-Band spectrum. Do you recall that?

**[VanBeber]:** Yes.

> **[Attorney]:** So in the days before the eventual tweet from the FCC chairman, Ms. VanBeber, you and others began to prepare for the possibility that the FCC would announce it was moving forward with a public auction for the C-Band; is that right?
>
> **[VanBeber]:** Yes. We felt like the sands had shifted a lot and that we needed to be prepared for different outcomes and just to be prepared so that we could pivot quickly.

100. As part of the February 10, 2022 testimony, VanBeber was shown an email chain from November 15, 2019 – ten days after the November 5, 2019 meeting and several days before the FCC publicly announced that it was rejecting the private auction approach. That email thread included VanBeber, individuals at SES, Intelsat, the CBA, and individuals from an outside communications group working with the CBA. In that thread the participants discussed a draft statement that began: "The FCC announcement proposing a public auction is a significant departure from the CBA market-based proposal."

### F. Intelsat Works on a Revised Private Auction Proposal

101. Following the November 5, 2019 meeting, where Intelsat's CEO had determined that their public auction approach was in "trouble" and that Nick Degani was indicating that Intelsat did not have "political support" for the public auction approach – meaning Chairman Pai was likely to reject the proposal – Intelsat went to work revising the proposal in a last ditch effort to regain support.

102. According to CW-1, during the time period immediately following the November 5, 2019 meeting with the FCC, the view internally was that Intelsat was going to continue trying to get one of their own proposals accepted by the FCC.

103. CW-1 explained that just after the early November FCC meeting, Intelsat began working on a revised proposal for their non-public auction plan. More specifically, he explained, that the revised plan showed that Intelsat would voluntarily make contributions to the U.S. Treasury based on the proceeds of the auction, which should have made the proposal more attractive to the FCC. According to CW-1, this plan was a reaction to the negative developments at the earlier meeting and an attempt to salvage the deal with the FCC.

104. CW-1 confirmed that the Board was likely kept in the loop given the proposal's importance and due to the lack of any information blackout at the time. CW-1 explained that, in the past, including when Intelsat itself had been making stock offerings, the Company had instituted formal "information blackouts," which had intentionally restricted the flow of information to board members to avoid raising eyebrows about potentially improper trading. CW-1 said that an impending blackout would have been communicated to him and his team, and that he was not aware of any blackout being communicated leading up to the selling of shares in early November 2019. CW-1 clarified that that no such blackout was in place at the time of the trades in early November, meaning that information was flowing freely to the board.

105. CW-1 also explained that, consistent with Intelsat's attempt to salvage their deal with the FCC, CEO Stephen Spengler, CFO David Tolley, and CBA representative Peter Pitsch[9] proceeded with trying to get a meeting with Director of U.S. National Economic Council, Larry Kudlow (working out of the White House).

106. CW-2 was also familiar with the revised proposal. According to CW-2, the CBA had always discussed the concept of adding a "voluntary contribution" to the U.S. Treasury as a possible lever in negotiating the proposed deal. He explained that after the meeting, the CBA and its members put together a revised proposal with additional details about the CBA members' willingness to make cash contributions. He said this proposal was part of their attempt to regain FCC support for the private auction proposal.

107. Indeed, on November 8, 2019, just three days after the November 5, 2019 meeting, the CBA filed a revised proposal with the FCC, and the CBA made yet another revised proposal on November 15, 2019. In a statement in open court – as part of Intelsat's bankruptcy proceedings – Intelsat's attorney explained these revised proposals as follows:

> On November 8th of 2019, the CBA responded to a request to clear more spectrum by saying specifically it was willing to clear more spectrum if its market-based proposal was adopted by the Commission and if the CBA was

[9] Media reports and press releases indicate that Pitsch was appointed Head of Advocacy and Government Affairs by C-Band Alliance by March 27, 2019.

designated the transition facilitator.

> A few days later, on November 15th, the CBA made another filing, saying that if the FCC accepted its proposal, it was prepared to make a significant contribution to the U.S. Treasury.

### G. The Insider Stock Sales

108. Just after markets closed on November 5, 2019—the same day that FCC officials privately indicated to Intelsat that they would push for a public auction—Morgan Stanley began soliciting the market to buy Intelsat stock. Morgan Stanley stated[10] that 10 million shares were for sale at a price between $24.50 and $25.00, and that the selling group was led by BC Partners. Later it was clarified that the offering price was set at $24.60 per share. At that price, the block would be sold for $246 million. By 8:00 pm, Morgan Stanley was telling investors that the offering was a few times oversubscribed, meaning they had sold all the shares, and would actually have to turn some buyers away.

109. After the Class Period, the *New York Post* investigated and reported on the trades in an article entitled, "***Intelsat's biggest investors sold shares just before massive stock plunge***." The article explained that sources told the New York Post that: "the $246 million block was shopped after markets closed on Nov. 5. There was no advance warning that the sale was coming, and **interested buyers were told they had an hour or so to decide**." The article explained, according to two shareholders "clobbered" by the trade, that Morgan Stanley had indicated the sellers were BC Partners and Silver Lake. Additionally, the article quoted "A hedge fund investor who bought stock in the Nov. 5 block sale," as stating:

> Our immediate reaction when the stock tanked was these f—ers knew something. . . . Even if BC only had knowledge of the FCC meeting, it was material.

110. CW-1 also stated that, shortly after the meeting with the FCC, David McGlade, BC Partners, and Silver Lake sold a large number of shares, as a group, in a transaction with

---

[10] These allegations are based on emails from Morgan Stanley and the potential purchasers who were solicited by Morgan Stanley, that have been reviewed by Lead Counsel.

Morgan Stanley after market hours. CW-1 found out about the stock sales after he noticed the high volume of trades on a New York Stock Exchange internal system at Intelsat. He advised that after learning about the trades, he called CFO David Tolley about the after-hour trades, and that Trolley responded that he knew nothing about it. CW-1 added that a short while later, Tolley then called CW-1 back to discuss the trades.

111. CW-1 explained that McGlade's ownership was nowhere near as big as BC Partners or Silver Lake, so it did not get as much attention despite it occurring at the same time. CW-1 said that he discussed this trading activity internally within Intelsat, but was not personally involved in any activity to actually conduct the trade, since the shares were privately held by those shareholders, meaning that the offering was not conducted by Intelsat itself. ***It was CW-1's understanding that the sales had not been given a "dance card," meaning the Company had not approved of the sales ahead of time, since the sales did not require approval by the Company***.

112. CW-1 indicated that he believes it is likely that prior to those trades, Defendant McGlade and the other directors received information about the meeting with the FCC from CEO Stephen Spengler or other executives. CW-1 explained that he had not seen those communications but that it was ***"obvious"*** that the other directors had been updated about the meeting. CW-1 also explained that he was not aware of any information blackout at the time of the trades, meaning that information was flowing freely to the Board. CW-1 recalled that he felt the trading was ***"outrageous"*** and that the situation at the Company around that time had gotten extremely negative.

113. CW-2 was aware of the sale of shares by BC Partners and other insiders between the meeting with the FCC and the mid-November 2019 announcement by the FCC requiring a public auction. CW-2 was not certain when he first heard about these trades, but said that he likely learned about the trades around the time that Chairman Pai tweeted that he was favoring a public auction.

114. CW-3 explained that McGlade, CFO David Tolley, CEO Steve Spengler, General Counsel Michelle Bryan, and Chief Commercial Officer Mike DeMarco worked together constantly and that some of them knew each other for "decades." CW-3 further explained that these members of Intelsat's leadership sat together on the 20th floor. CW-3 commented that the potential upside of the deal was so great that if it succeeded, the leadership would make so much that people would retire, adding that they were all paying very close attention to the issue.

115. CW-3 described Justin Bateman and Raymond Svider as "very involved" with Intelsat and explained that they sometimes came to the 20th Floor to work with Intelsat's leadership. CW-3 recalled that Tolley often had calls with Bateman, and also recalled that Tolley knew Svider from before working together on Intelsat.

116. CW-3 also added that McGlade had previously run Intelsat and regularly came into the office to work on the 20th floor, in addition to attending Board meetings. CW-3 explained that McGlade stayed heavily involved in the Company and with the people at the more senior levels. CW-3 further explained that, to update McGlade and BC Partners about developments in the C-Band negotiations, Spengler would just jump on a conference call, and that they would not usually wait to prepare more formal communications, like memos. CW-3 added that people would often just be updated in-person, as they worked so near each other on the 20th floor, and that Spengler would immediately debrief McGlade and others on the 20th floor with updates about the developments on the C-Band negotiations.

117. Indeed, bankruptcy filings have further confirmed the substantial real-time communications that occurred between Intelsat's senior insiders. For example, in a hearing on SES's motion to compel production of text messages from Intelsat's General Counsel Michelle Bryan, it was demonstrated that Intelsat's CEO Stephen Spengler, CFO David Tolley, Chief Technology Officer Bruno Fromont, General Counsel Michelle Bryan, and Defendant McGlade communicated concerning the C-Band issue. Publicly filed exhibit lists also confirm that there were text messages between Defendant McGlade, Michelle Bryan, David Tolley, and Stephen Spengler.

118. Additionally, exhibit lists confirm that Defendants McGlade, Svider, and Bateman received updates from Intelsat's management aside from those presented in formal board meetings. For example, on November 18, 2019, Intelsat's General Counsel sent an email with the subject "C-band Update" to Defendants McGlade, Svider, and Bateman, among others. Ms. Bryan sent a similar update on November 25, 2019.

**H. The Truth is Revealed and Intelsat Collapses**

119. On November 8, 2019, two *ex parte* communications from the CBA were posted to the FCC's website. The first disclosed – without revealing key details of the meeting – that the CBA had met with senior FCC staff on November 5, 2019. The second disclosed the CBA's revised proposal, which included an offer to remit a portion of the proceeds of any private auction to the U.S. Treasury.

120. The industry publication *Fierce Wireless* wrote that in the revised proposal the CBA said it has committed to making a "significant contribution to the U.S. Treasury," although it did not specify a percentage or amount. The article further reported that, according to the alliance, "a portion of auction proceeds, in excess of those needed to cover the costs for the auction and the transition of the spectrum, will be returned to the U.S. Treasury."

121. While these disclosures only very partially revealed the negative direction that the CBA's negotiations were headed in, they were enough to significantly impact Intelsat's stock. The mid-day *ex parte* disclosures led to Intelsat's stock price falling by 1.85% on November 8, 2019, compared to the prior close. The stock price closed on November 8, 2019, at a price 9% lower than the closing price on November 5, 2019 (*i.e.*, the date when the insiders sold). However, it continued falling the next business day for an additional drop of 2.72% on November 11, 2019. Intelsat's stock price closed on November 11, 2019, at a price 11.6% lower than the closing price on November 5, 2019 (*i.e.*, the date when the insiders sold).

122. Over the next several days, the stock price of Intelsat faced continued pressure as additional rumors trickled out about the FCC deal.

123. On the evening of November 12, 2019, JPMorgan published an analyst report downgrading Intelsat's price target from $34 to only $22. That article credited the rumors that Senator Kennedy's pushback against a public auction had gained momentum, and that there was a decreased likelihood of the C-Band getting a clear win from the FCC. The note also stated: "We see the C-Band process looking more complicated than it seemed only weeks ago." On November 13, 2019, Intelsat's stock declined from a prior close of $20.39 down to $14.43, for a total daily drop of 29.23%, and a drop of 45% compared to the closing price on November 5, 2019 (*i.e.*, the date when the insiders sold). After markets closed on November 13, 2019, *Barron's* published an article tracing the daily decline in Intelsat's price to the increased concerns about clearing a deal with the FCC.

124. On November 14, 2019, JPMorgan issued an analyst report noting that there was some initial skepticism by many about its reports the prior day, that the FCC was turning against Intelsat. However, JPMorgan commented, "as Wednesday wore on and into Thursday, it seems like more investors are hearing a message like we heard early this week: that something has changed and the C-Band process, which was in great shape as recently as last week, has been derailed. Whether the derailment is permanent or temporary we cannot know, though we may hear more from the FCC in the next few days." On November 14, 2019, Intelsat's stock price declined from a closing price the prior day of $14.43, down to a price of $12.13, for a total daily decline of 15.94%, and a drop of 54% compared to the closing price on November 5, 2019 (*i.e.*, the date when the insiders sold).

125. On November 18, 2019, around noon, FCC Chairman Ajit Pai sent out a series of messages through the online platform, Twitter, firmly stating he was going with a public auction, rather than the C-Band Alliance's plan. The text of his messages was as follows:

> I've outlined four principles that the @FCC must advance regarding C-band spectrum: we must (1) free up significant spectrum for #5G, (2) do so quickly, (3) generate revenue for the federal government, and (4) ensure continued delivery of services currently using the C-band.

* * *

> After much deliberation and a thorough review of the extensive record, I've concluded that the best way to advance these principles is through a public auction of 280 megahertz of the C-band conducted by the @FCC's excellent staff.
>
> * * *
>
> With a strong track record of successful auctions, I'm confident they'll quickly conduct a public auction that will give everyone a fair chance to compete for this #5G spectrum, while preserving availability of the upper 200 MHz of the band for continued delivery of programming.
>
> * * *
>
> Earlier today, the @FCC sent letters to various elected officials outlining my decision in the C-band proceeding.

126. In addition to these messages, Chairman Pai also published a letter describing his decision. The letter stated, in substantial part:

> Thank you for your interest in the Federal Communications Commission's ongoing rulemaking related to spectrum in the 3.7-4.2 GHz band, commonly called the "C-band." C-Band spectrum is widely seen as a critical swath of mid-band spectrum that could help drive American leadership in 5G, the next generation of wireless connectivity. This spectrum offers both geographic coverage and the capacity to transmit large amounts of data—a combination that is appealing to entrepreneurs and wireless consumers alike.
>
> I previously announced that I would make a decision on how the FCC should proceed by this fall and outlined four principles that the FCC must advance through this rulemaking. *First,* we must make available a significant amount of C-band spectrum for 5G. *Second*, we must make C-band spectrum available for 5G quickly. *Third*, we must generate revenue for the federal government. And *fourth*, we must protect the services that are currently delivered using the C-band so they can continue to be delivered to the American people.
>
> After much deliberation and a thorough review of the extensive record, ***I have concluded that the best way to advance these principles is through an auction of 280 megahertz of the C-Band conducted <u>by</u> the Federal Communications Commission's excellent staff.*** With a quarter-century track record of transparent and successful auctions, I am confident that they will conduct a public auction that will afford all parties a fair opportunity to compete for this 5G spectrum, while preserving the availability of the upper 200 megahertz of this band for the continued delivery of programming. Thank you once again for your interest.

127. Many news outlets published articles understanding this to mean that the FCC would be rejecting the CBA's proposal.

(a) *The Wall Street Journal* published an article on November 18, 2019, titled "FCC Backs Public Auction of 5G Airwaves." The article explained that, "[t]ens of billions of dollars in potential proceeds are at stake," and that previously the "FCC appeared to be moving toward the satellite firms' private auction plan."

(b) Reuters published an article on November 18, 2019, stating that the "Federal Communications Commission Chairman Ajit Pai said on Monday ***he backs a public auction*** to free up spectrum in a key band currently used for delivering video content for next-generation 5G wireless networks, an announcement that sent a major satellite company's shares down 40%."

(c) The industry publication *Fierce Wireless* published an article on November 18, 2019, stating that the CBA's proposal "***appears to have flown out the window***, with the Federal Communications Commission (FCC) staff confirming to media on Monday that they're set to commence an auction of C-band spectrum before the end of 2020."

(d) The industry publication *RCR Wireless* published an article on November 18, 2019, with the headline "Pai tells senators that C Band auction will be conducted publicly by the FCC."

(e) The industry publication *Space News* published an article on November 18, 2019, titled "***Satellite operators lose battle for private C-band auction worth billions***."

(f) On November 18, 2019, CNBC published an article with the headline "Satellite stock Intelsat drops 40% after FCC 5G decision."

128. As these articles indicated, on the news that the FCC was highly likely to reject the CBA's proposal, Intelsat's stock collapsed. It fell 40.12% on this news compared to the prior day close, for a total decline of 70% since November 5, 2019—the date the insiders sold their shares.

129. The next day, November 19, 2019, markets continued digesting the terrible news for Intelsat, as a variety of additional articles and analyst reports were published about the situation:

(a) JPMorgan analyst Philip Cusick wrote a research note late on November 18, 2019, stating that the day "brought a flurry of new information, almost all of it negative for the C-Band process and Intelsat shares. FCC Chairman Pai came out in favor of a public auction but with little detail about how to get there." The note went on to lower JPMorgan's price target for the Company by 59% from $22 to $9. It also stated "After supporting a private auction as recently as 2 weeks ago, FCC Chairman Pai called for a public auction that frees up 300 MHz of spectrum quickly. Now that this is official we don't see how the FCC can back down to some kind of private or 'hybrid' auction."

(b) Evercore soon followed suit, publishing a note on November 18, 2019, stating: "The political winds have clearly shifted sharply in DC, and not in Intelsat's favor. As a result, we're cutting our rating to In Line, and lowering our target to $11 from $38." The report also stated "FCC Chairman Pai has announced his decision to carry out a public auction of 280MHz of C-Band spectrum, instead of the private auction process the C-Band Alliance had proposed, and which seemed to be on track only a few days ago."

(c) *Barron's* published an article on November 19, 2019, with a headline stating, "Intelsat Stock Falls Further on Spectrum Auction." The article stated "Intelsat stock continued to unravel Tuesday following Federal Communications Commission Chairman Ajit Pai's decision yesterday to hold a public auction of a portion of the C-Band radio spectrum."

(d) The popular investor website *The Motley Fool* published an article on November 19, 2019, titled "Why Intelsat Stock Just Lost Another 21%" stating that the continued fall of Intelsat stock was the result of investors digesting the analyst notes published by JPMorgan and Evercore.

130. On November 19, 2019, Intelsat's stock fell another 24.16% compared to the closing price the prior day, for a total decline of 77% since November 5, 2019—the date the insiders sold their shares.

131. Over the coming months Intelsat continued to collapse. Of particular note, on February 5, 2020, news outlets began reporting that Intelsat was considering Chapter 11 bankruptcy, which rumors were fueled by reports that the Company had hired the law firm Kirkland & Ellis LLP. *Bloomberg* reported that the possibility of bankruptcy could disrupt any proposed plan for clearing the C-Band. *The Motley Fool* published an article the following day, noting that payment of Intelsat's heavy debt load may only be possible if the government's C-Band plan provides sufficient cash to the Company.

132. On February 20, 2020, *Fierce Wireless* reported that "Intelsat declares C-Band Alliance dead as it seeks more money from FCC." That article reported that Intelsat had been pushing the FCC for higher payments than the agency had previously indicated it was prepared to make. However, it also explained that the CBA had fallen apart, and that Intelsat and SES would be working separately. Months later, SES would sue Intelsat, alleging that Intelsat improperly reversed course on their agreement to work together.

133. Then, on February 28, 2020, the FCC voted 3-2 (with Chairman Pai voting as he previously indicated he would - breaking an otherwise partisan divide), to commit to a public auction plan for clearing the C-Band. The plan gave CBA members $9.7 billion to cover the costs of migrating their C-Band business and to incentivize them to move quickly rather than litigating. However, this paled in comparison to the $60 billion plus in proceeds Intelsat and the C-Band expected from the original private auction concept.

134. A few months after the FCC's public auction plan was announced, Intelsat filed for Chapter 11 Bankruptcy. On May 14, 2020, *Fortune* described the bankruptcy as follows:

> In a move that had been telegraphed for weeks, Intelsat said in its filing that it couldn't afford to service its heavy debt load while also paying hundreds of millions of dollars to transition its network to new technology to allow for a federal auction of some of its airwave licenses. The Federal Communications Commission in February adopted a plan to sell off some of the airwaves held by Intelsat and

> its peers to wireless carriers that need the spectrum for 5G, but the satellite companies first need to make costly alterations to their operations.

135. As of the filing of this complaint, Intelsat remains in bankruptcy. The Company's stock has been delisted from the NYSE and its stock is trading over the counter at around $0.60 per share, compared to its closing price of $26.33 on the day the insiders made their trades—a staggering decline of more than 97%.

## VI. ALLEGATIONS SUPPORTING SCIENTER

136. As described below, the Defendants possessed material non-public information at the time that they engaged in the stock sales described herein. Defendants' possession of this knowledge while trading demonstrates their scienter. Specifically, Defendants knew (*i.e.*, possessed the information) of (a) the then-undisclosed November 5, 2019, meeting with the FCC, (b) the information disclosed to the Company during that meeting regarding the likelihood that the FCC would reject the CBA proposal, (c) that Intelsat was preparing a new compromise private auction proposal that would be less favorable to the CBA members, and (d) other material non-public information about Intelsat's plans, understanding, and approaches toward negotiating with the FCC and procuring a deal for clearing the C-Band spectrum (together, the "material non-public information," or "MNPI").

137. The following allegations strongly support the conclusion that Defendants knew of and possessed the MNPI at the time they traded.

### A. Materiality and Free Flow of Information

138. As explained herein, the CBA proposal was a true bet-the-company plan. If the proposal succeeded, the Company's stock price was expected to increase many times over. If the deal failed, the Company would likely not have sufficient resources to service its debt. The proposal related to the future of Intelsat's core business serving customers by broadcasting over the C-Band. Analysts, investors, and news outlets reported on the proposal and negotiations, and within the Company there was intense interest in the developments surrounding the likelihood of the C-Band proposal succeeding, and Intelsat's stock price routinely reacted to news about those

developments. In fact, when the deal fell apart, Intelsat's stock price collapsed, and the Company was promptly pushed into bankruptcy.

139. This is exactly the sort of information the Company would have shared in near real-time with its Board. CW-1 corroborated this point, explaining that the Board was likely kept in the loop given the importance of this information. CW-1 explained that it was "obvious" that these insiders had been updated about the meeting. Additionally, the November 5, 2019 FCC meeting itself directly involved Intelsat's CEO—further indicating that it was dealt with at extremely high levels at the Company.

140. In the three-day period after the FCC meeting Intelsat worked to put together a revised proposal to salvage the deal, and then published that proposal on November 8, 2019. This proposal involved agreeing to remit a significant contribution to the U.S. Treasury. It is beyond the realm of possibility that Intelsat would have gone forward with preparing this revised proposal—which may have involved giving away value greater than the Company's then-current market value—without oversight from the Board.

141. The reactions to the FCC meeting among senior members of the Company also support the conclusion that it was exceptionally material. The news disclosed in the meeting was received as a "complete 180" turn for the worse. It prompted attempts by senior executives to reach out to senior members of President Trump's administration. CW-1 surmised, after meeting with CEO Spengler, that the meeting with the FCC must have been one of the top three worst of CEO Spengler's career.

142. CW-1 explained that at the time of the insider trades there was no information blackout or other restriction on information flowing to the Board, as there had been at certain points in the past.

143. CW-2 explained that BC Partners was generally kept up to speed on the negotiations with the FCC and the C-Band issue by Intelsat. CW-2 advised that there were usually two weekly calls about the C-Band issue: one composed of Senior Satellite company executives, and one was the CEO meeting, where they met with the CEOs of Intelsat and SES.

He further advised that Intelsat senior management was "very up to speed" on the FCC negotiations, and that it was senior management who would update Intelsat's Board. CW-2 was aware that CEO Stephen Spengler generally kept Intelsat's Board updated on the FCC negotiations because Spengler sometimes asked CW-2 for information and slides to put in presentations to the Board. CW-2 added that he participated in one Intelsat Board meeting in April 2019 and that during that meeting the Board was updated on the plans for C-Band spectrum, and negotiations with the FCC. CW-2 said that he thinks the updates would have become even more frequent as the negotiations progressed.

144. Additionally, CW-2 recalled participating in a meeting on Halloween, before the November 5th meeting, ***at BC Partners' office*** in New York City. CW-2 explained that the participants in this meeting included Intelsat CFO David Tolley, Intelsat Board member John Diercksen and representatives from Verizon. CW-2 recalled seeing Justin Bateman in BC's office during that meeting, but that Bateman did not participate in that specific meeting.

145. CW-2 advised that the purpose of this meeting was to discuss the structure of the CBA's proposed public auction approach to clearing spectrum and, more specifically, to discuss an auction design that would fit the goals of the CBA, Verizon, and other members of the industry. He explained that it would not have made sense to have such a detailed conversation about the logistics of the CBA's proposal, if they had not thought the CBA's proposal would still succeed at that time. CW-2 added that Verizon and others similarly-situated to Verizon had not favored the CBA's previous auction design proposals because it was not a traditional auction format and because it lacked information found in traditional auctions. CW-2 explained that during the meeting they discussed moving to an approach that would be more similar to other auctions Verizon had participated in.

146. The occurrence of this meeting – in which detailed information about the C-Band issue was discussed in BC Partners' offices with senior Intelsat employees (including at least one Board member), supports the conclusion that Intelsat's Board and BC Partners' were engaged in

and informed about the material developments related to the negotiations with the FCC—such as the November 5, 2019, meeting.

147. CW-3 explained that McGlade, CFO David Tolley, CEO Steve Spengler, General Counsel Michelle Bryan, and Chief Commercial Officer Mike DeMarco worked together constantly and that some of them knew each other for "decades." CW-3 further explained that these members of Intelsat's leadership sat together on the 20th floor. CW-3 commented that the potential upside of the deal was so great that if it succeeded, the leadership would make so much that people would retire, adding that they were all paying very close attention to the issue.

148. CW-3 described Justin Bateman and Raymond Svider as "very involved" with Intelsat and explained that they sometimes came to the 20th Floor to work with Intelsat's leadership. CW-3 recalled that Tolley often had calls with Bateman, and also recalled that Tolley knew Svider from before working together on Intelsat.

149. CW-3 also added that McGlade had previously run Intelsat and regularly came into the office to work on the 20th floor, in addition to attending Board meetings. CW-3 explained that McGlade stayed heavily involved in the Company and with the people at the more senior levels. CW-3 further explained that, to update McGlade and BC Partners about developments in the C-Band negotiations, Spengler would just jump on a conference call, and that they would not usually wait to prepare more formal communications, like memos. CW-3 added that people would often just be updated in-person, as they worked so near each other on the 20th floor, and that Spengler would immediately debrief McGlade and others on the 20th floor with updates about the developments on the C-Band negotiations.

150. Additionally, Intelsat's senior insiders, including Defendant McGlade, communicated by text message; and it is known that Defendants McGlade, Svider, and Bateman received updates about the C-Band issue by email. That these Defendants were kept updated much more frequently, and informally, than merely receiving formal board materials supports the inference that they would have been updated about the monumentally significant November 5, 2019 meeting.

151. Defendant McGlade was the chairman of the Board. Additionally, he was previously the CEO of the Company. He would obviously have been kept fully updated about the material non-public information at issue herein due to its importance.

152. The other members of the Board also would have been kept informed of this information. Defendants Svider and Bateman were members of Intelsat's board as appointees by BC Partners, were senior employees of BC Partners, and their knowledge can be directly imputed to BC Partners. Additionally, it is overwhelmingly likely that Defendants Svider and Bateman would have communicated this material non-public information to others within BC Partners. Silver Lake had special information rights due to its agreements with BC Partners and the Company. Silver Lake and BC Partners were the Company's two largest shareholders – and they were not *merely* large shareholders – they had sponsored the Company's IPO and the Company recognized their considerable influence over its decision making.

**B. Timing and Manner of the Trades**

153. The timing and the circumstances of these trades strongly supports the inference that Defendants had the material non-public information at the time of their transactions.

154. The sales occurred just hours after the FCC meeting. The most obvious inference is that Defendants learned the bad news and then immediately took action to dump their shares.

155. The trade was conducted in a manner that prioritized speed. The shares were urgently shopped after hours at a significant discount to the day's closing market price. Morgan Stanley brokered the deal with "no advance warning that the sale was coming, and interested buyers were told they had an hour or so to decide." The speed at which these insiders offloaded their shares further supports the conclusion that this was a desperate sell before the bad news (which they knew about) became public and the stock price collapsed.

156. Similarly, the insiders sold their shares at a steep 6.6% discount to the public price that the shares traded at. This indicates an urgency to sell the shares and supports the conclusion that Defendants knew the bad news and were willing to take a sizeable discount to the current share price in order to sell the shares as quickly as possible.

157. Additionally, the fact that the transaction involved three separate insiders working as a group strengthens the suspicious nature of the trading, by undermining alternative explanations for the timing of the trade, and by strengthening the inference the information was being shares amongst the insiders.

**C. Historical Trading**

158. During the Class Period, Intelsat was categorized as a foreign private issuer. As a result of this classification, its shareholders were not required to file Form 4's with the SEC documenting their trading. As a result, it is not possible, without discovery, to meaningfully compare these trades to prior trades.

159. However, this lack of information lends circumstantial additional support to the allegations herein. Without careful investigation by journalists and counsel, most investors would likely ***never*** have known of these trades. Defendants undoubtedly knew this. Thus, the lack of Form 4 requirements would have provided Defendants with a sense of safety – perhaps explaining their willingness to commit these otherwise obviously impermissible trades.

160. The size of the trading was significant. There were approximately 140 million shares of Intelsat stock outstanding at the time of the trade. This means that about 7% of the total stock in the Company was sold through this fire sale transaction. As of the Company's last annual report, where it disclosed these insiders' holdings, they held a combined total of about 73.7 million shares, meaning that the block they sold on November 5, 2019, was roughly ***14% of their total holdings***. The market dynamics of insiders making large trades – which sends negative price signals – would likely have made it difficult for them to shop a larger block, as it would have triggered major investor interest and concern.

## VII. LOSS CAUSATION

161. As a result of their purchases of Intelsat common stock during the Class Period, Lead Plaintiff and the other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

162. Defendants traded Intelsat common stock while in possession of material non-public information. Later, as the information became publicly known – and as the risks hidden by Defendants' omissions manifested into negative events – the price of Intelsat common stock declined sharply as a result of such disclosure.

163. On November 8, 2019, when it was disclosed that Intelsat's CEO had met with FCC staff in the November 5, 2019 closed-door meeting several days earlier, and that Intelsat had submitted a revised proposal that was less favorable than its prior plan, Intelsat's stock price fell by 1.85% on November 8, 2019, compared to the prior close. However, it continued falling the next trading day for an additional drop of 2.72%. The stock price closed on November 8, 2019, at a price 9% lower than the closing price on November 5, 2019 (*i.e.*, when the insider Defendants sold). The stock price closed on November 9, 2019, at a price 11.6% lower than the closing price on November 5, 2019 (*i.e.*, when the insider Defendants sold).

164. On November 18, 2019, when it was disclosed that the FCC would almost certainly be rejecting the C-Band Alliance proposed, Intelsat's stock fell by about 40%. The closing price on November 18, 2019, was 70% below the Company's closing price the day the insiders sold their shares.

165. On November 19, 2019, as the market continued to digest the disclosures of the prior day, Intelsat's stock price fell by another 24.16%, closing 77% below the price Intelsat stock had closed at on the day the insiders sold their shares.

## VIII. CONTEMPORANEOUS TRADING

166. Lead Plaintiff purchased Intelsat common stock contemporaneously (within the meaning of §20A of the Exchange Act, 15 U.S.C. §78t-1) with the Defendants' sales of Intelsat common stock.

167. Defendants began selling their shares on the evening of November 5, 2019. Courts have eschewed any ridged rule as to what period of time constitutes contemporaneous trading. Based on the factual circumstances of this Action, Lead Plaintiff submits that a period of 13 days is sufficiently near in time to Defendants' sales to constitute contemporaneous trades.

As such, any trades made between November 5, 2019 and November 18, 2019 are alleged to be contemporaneous.

168. The following tables shows the purchases, aggregated by day, during the relevant time period by Walleye Manager Opportunities LLC:

| Purchases by Walleye Manager Opportunities LLC | |
|---|---|
| 11/05/19 | 1,860.00 |
| 11/06/19 | 3,864.00 |
| 11/07/19 | 732.00 |
| 11/08/19 | 1,191.00 |
| 11/11/19 | 683.00 |
| 11/12/19 | 20.00 |
| 11/13/19 | 4,559.00 |
| 11/14/19 | 3,400.00 |
| 11/15/19 | 310.00 |
| 11/18/19 | 4,900.00 |

169. The following tables shows the purchases, aggregated by day, during the relevant time period by Walleye Opportunities Master Fund Ltd.:

| Purchases by Walleye Opportunities Master Fund Ltd. | |
|---|---|
| 11/05/19 | 5,036.00 |
| 11/06/19 | 7,716.00 |
| 11/07/19 | 19.00 |
| 11/08/19 | 5,867.00 |
| 11/11/19 | 4,605.00 |
| 11/12/19 | 24,000.00 |
| 11/13/19 | 9,004.00 |
| 11/14/19 | 2,401.00 |
| 11/15/19 | 6,419.00 |
| 11/18/19 | 32,437.00 |

## IX. APPLICATION OF PRESUMPTION OF RELIANCE

170. To the extent that reliance is an element of their claims, Lead Plaintiff and the Class members are entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated upon omissions of material fact. The allegations herein primarily allege omissions where there was an affirmative duty to disclose information.

171. To the extent that reliance is an element of their claims, Lead Plaintiff and the Class members are also entitled to a presumption of reliance on Defendants' omissions pursuant to the fraud-on-the-market theory:

(a) Intelsat's common stock was actively traded on the NYSE, an informationally efficient market, throughout the Class Period;

(b) Intelsat's stock traded at high volumes during the Class Period;

(c) Intelsat filed an annual report and quarterly financial reports with the SEC;

(d) Intelsat communicated with public investors by means of established market communication mechanisms, including through regular dissemination of press releases on the major news wire services, and through other wide-ranging public revelations, such as communications with the financial press, securities analysts, and other similar reporting services;

(e) the market reacted promptly to public information disseminated by Intelsat;

(f) Intelsat stock was covered by numerous securities analysts employed by major brokerage firms who wrote reports that were publicly available and entered the public marketplace;

(g) the material omissions alleged herein would tend to induce a reasonable investor to misjudge the value of Intelsat's stock;

(h) without knowledge of the omitted material facts alleged herein, Lead Plaintiff and other Class members purchased or otherwise acquired Intelsat stock between the time Defendants failed to reveal material facts and the time the true facts began to be revealed.

## X. CLASS ACTION ALLEGATIONS

172. Lead Plaintiff brings this federal securities class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of itself and all persons and entities that purchased or otherwise acquired Intelsat common stock from November 5, 2019 through November 18, 2019, inclusive, (the "Class Period"), and were damaged thereby (the "Class"), which includes the investors who purchased Intelsat common stock contemporaneously with Defendants' sales of Intelsat common stock on or about November 5, 2019.

173. Excluded from the Class are: (i) Defendants and Intelsat; (ii) members of the immediate family of any Individual Defendant; (iii) any person who was an officer or director of Intelsat, Silver Lake, or BC Partners during the Class Period; (iv) any firm, trust, corporation, or other entity in which Defendants have, has, or had a controlling interest; and (v) the legal representatives, affiliates, heirs, successor-in-interest, or assignees of any such excluded person, including Intelsat and any Defendant's employee retirement and/or benefit plan(s) and their participants or beneficiaries, to the extent they made purchases through such plan(s).

174. The Class members are so numerous that joinder of all members is impracticable. During the Class Period, Intelsat had more than 140 million common shares outstanding, which shares were actively traded on the NYSE.

175. While the exact number of Class members is unknown to Lead Plaintiff at this time, and can only be ascertained through appropriate discovery, it is likely that the proposed Class numbers in the thousands and is geographically widely dispersed. Record owners and other Class members may be identified from records maintained by Intelsat and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

176. Lead Plaintiff's claims are typical of the claims of the Class members. All Class members were similarly affected by Defendants' conduct in violation of the Exchange Act as alleged herein.

177. Lead Plaintiff will fairly and adequately protect the interests of all Class members. Lead Plaintiff has retained counsel competent and experienced in class and securities litigation.

178. There is a well-defined community of interest in the questions of law and fact involved in this case. Common questions of law and fact exist as to all Class members, and predominate over any questions solely affecting individual Class members. The questions of law and fact common to the Class include, without limit:

(a) whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;

(b) whether Defendants' trading constitutes a deceptive device under Rule 10b-5 of the Exchange Act;

(c) whether the Defendants' omitted to disclose material facts that Defendants had a duty to reveal;

(d) whether Defendants acted with scienter when selling their Intelsat stock;

(e) whether the price of Intelsat stock during the Class Period was artificially maintained at inflated levels by Defendants' failure to disclose material information they had a duty to disclose;

(f) whether reliance is an element of Lead Plaintiff and Class Members' claims and, to the extent that it is, whether reliance may be presumed pursuant to *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), or the fraud on the market doctrine.

(g) whether Lead Plaintiff and other Class members traded contemporaneously with Defendants; and

(h) whether and to what extent Lead Plaintiff and Class members suffered losses due to Defendants' fraudulent conduct.

179. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because, among other things, joinder of all Class members is impracticable. Furthermore, because the damages suffered by the individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XI. COUNTS

### A. COUNT I: Violation of § 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against Defendants McGlade, Silver Lake, and BC Partners

180. Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

181. This Claim is brought against Defendants McGlade and each of the Silver Lake and BC Partners Defendants under §10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5 there under, 17 C.F.R. §240.10b-5.

182. The information provided to Defendants McGlade, Silver Lake, and BC Partners about the FCC Meeting and about Intelsat's plans for a revised CBA proposal was material and non-public. In addition, the information was, in each case, considered confidential by Intelsat, which had policies in place barring insider trading.

183. Defendants Silver Lake and BC Partners obtained the material non-public information from Intelsat and in the context of their roles as insiders of Intelsat, including due to Defendant Svider's and Bateman's positions at Intelsat, and through their information rights afforded by their shareholder and governance agreements. Defendant McGlade also obtained the material non-public information due to his role as an insider, including through his service as the Chairman of Intelsat's Board.

184. Defendants McGlade, Silver Lake, and BC Partners knew or recklessly disregarded, that they owed a fiduciary duty, or obligation arising from a similar relationship of trust and confidence, to Intelsat and its shareholders to keep the information confidential.

185. Nevertheless, while in possession of material, non-public, adverse information, Defendants sold approximately 10 million shares of Intelsat on or about November 5, 2019.

186. By virtue of the foregoing, Defendants McGlade, Silver Lake, and BC Partners, and each of them, in connection with the purchase or sale of securities, by the use of the means or instrumentalities of interstate commerce, or of the mails, or a facility of a national securities exchange, directly or indirectly: (a) employed devices, schemes, or artifices to defraud; (b)

omitted to disclose information that they had a duty to disclose; and/or (c) engaged in acts, practices, or courses of business that operated, or would have operated, as a fraud or deceit upon persons.

187. By virtue of the foregoing, Defendants McGlade, Silver Lake, and BC Partners, and each of them, directly or indirectly, violated §10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5 there under, 17 C.F.R. §240.10b-5.

188. Lead Plaintiff and members of the Class purchased Intelsat common stock without access to this material, non-public, adverse information. Lead Plaintiff and members of the Class purchased Intelsat stock contemporaneously with Defendants' sales of that stock on or around November 5, 2019. Lead Plaintiff and members of the Class purchased Intelsat stock during the period from November 5, 2019 through November 18, 2019, and during this period Defendants' omitted to disclose information they had a duty to disclose.

189. When the material adverse information was eventually revealed and when the risks attenuated by that undisclosed information came to bear, Intelsat's stock price declined precipitously and investors suffered economic loss, *i.e.*, damages.

**B. COUNT II: Violation of § 20A of the Exchange Act Against Defendants McGlade, and Silver Lake, and BC Partners**

190. Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

191. This Claim is brought against Defendants McGlade and each of the Silver Lake and BC Partners Defendants under §20A of the Exchange Act, 15 U.S.C. §78t-1.

192. The information provided to Defendants McGlade, Silver Lake, and BC Partners about the FCC Meeting and about Intelsat's plans for a revised CBA proposal was material and non-public. In addition, the information was, in each case, considered confidential by Intelsat, which had policies in place barring insider trading.

193. Defendants Silver Lake and BC Partners obtained the material non-public information from Intelsat and in the context of their roles as insiders of Intelsat, including due to

Defendant Svider's and Bateman's positions at Intelsat, and through their information rights afforded by their shareholder and governance agreements. Defendant McGlade also obtained the material non-public information due to his role as an insider, including through his service as the Chairman of Intelsat's Board.

194. Defendants McGlade, Silver Lake, and BC Partners knew or recklessly disregarded that they owed a fiduciary duty, or obligation arising from a similar relationship of trust and confidence, to Intelsat and its shareholders to keep the information confidential.

195. Nevertheless, while in possession of material, non-public adverse information, Defendants sold approximately 10 million shares of Intelsat on or about November 5, 2019.

196. By virtue of the foregoing, Defendants McGlade, Silver Lake, and BC Partners , and each of them, in connection with the purchase or sale of securities, by the use of the means or instrumentalities of interstate commerce, or of the mails, or a facility of a national securities exchange, directly or indirectly engaged in conduct that constituted a violation of § l0(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5 there under, 17 C.F.R. §240.10b-5.

197. Lead Plaintiff and members of the Class purchased Intelsat stock contemporaneously with these Defendants, without access to this material, non-public, adverse information.

198. By virtue of the foregoing, these Defendants are jointly and severally liable to Plaintiff and the Class for their insider sales pursuant to §20A of the Exchange Act, 15 U.S.C. §78t-1.

199. When the material adverse information was eventually revealed and when the risks attenuated by that undisclosed information came to bear, Intelsat's stock price declined and investors suffered economic loss, *i.e.*, damages.

### C. COUNT III: Violation of § 20(a) of the Exchange Act Against Defendants Svider and Bateman

200. Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

201. This Claim is brought against Defendants Svider and Bateman for control person liability under §20(a) of the Exchange Act. Defendants Svider and Bateman were control persons of BC Partners, due to their senior positions at BC Partners as described herein.

202. Pursuant to §20(a) of the Exchange Act: "Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable . . . unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action."

203. The Defendants named in this Count did not act in good faith and directly and/or indirectly induced the wrongful acts complained of herein by: (a) permitting the insider sales to occur with actual knowledge or reckless disregard for whether the entities trading possessed material non-public information; or (b) failing to adequately supervise their own action in connection with the acquisition of the Inside Information and trading thereon.

204. By virtue of the foregoing, the Defendants named in this count are jointly and severally liable, pursuant to §20(a) of the Exchange Act, to Lead Plaintiff and the Class, with the Defendants liable under the Counts 1-2 above.

## XII. PRAYER FOR RELIEF

205. **WHEREFORE**, Lead Plaintiff respectfully prays for judgment against the Defendants as follows:

(a) Determining that this action is a proper class action maintained under Rule 23 of the Federal Rules of Civil Procedure, certifying Lead Plaintiff as Class representative, and appointing Labaton Sucharow LLP as Class counsel pursuant to Rule 23(g);

(b) Determining and declaring that Defendants violated the Exchange Act by reason of the acts and omissions alleged herein;

(c) Awarding Lead Plaintiff and the Class compensatory damages against all Defendants, jointly and severally, in an amount to be proven at trial together with interest thereon;

(d) Awarding Lead Plaintiff and the Class damages equal to disgorgement of Defendants wrongful gains *i.e.*, the losses they avoided with the stock sales at issue herein;

(e) Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including, but not limited to, attorneys' fees and costs incurred by consulting and testifying expert witnesses; and

(f) Granting such other and further relief as this Court may deem just and proper.

## XIII. DEMAND FOR TRIAL BY JURY

206. Lead Plaintiff hereby demands a trial by jury of all issues so triable.

Dated: November 28, 2022

Respectfully submitted,

**LABATON SUCHAROW LLP**

By: */s/ Carol C. Villegas*

Carol C. Villegas (admitted *pro hac vice*)
David J. Schwartz (admitted *pro hac vice*)
Jake Bissell-Linsk (admitted *pro hac vice)*
140 Broadway
New York, NY 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
Email: cvillegas@labaton.com
Email: dschwartz@labaton.com
Email: jbissell-linsk@labaton.com

*Counsel for Lead Plaintiff the Walleye Group and Lead Counsel for the Proposed Class*

**WAGSTAFFE, VON LOEWENFELDT, BUSCH & RADWICK LLP**
James M. Wagstaffe (#95535)
Frank Busch (#258288)
100 Pine Street, Suite 725
San Francisco, CA 94111
Telephone: (415) 357-8900
Facsimile: (415) 357-8910
Email: wagstaffe@wvbrlaw.com
Email: busch@wvbrlaw.com
*Liaison Counsel for Lead Plaintiff the Walleye Group and the Proposed Class*

**CERTIFICATE OF SERVICE**

I certify that, on the date stamped above, I caused this document to be filed with the Clerk of the Court using the CM/ECF system, which will serve all parties that have appeared in the case by emailing notice of filing to their counsel of record.

/s/ *Carol C. Villegas*
Carol C. Villegas